[Cite as *Premier Therapy, L.L.C v. Childs*, 2016-Ohio-7934.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| PREMIER THERAPY, LLC, | ) | CASE NO. 14 CO 0048 |
| | ) | 15 CO 0028 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| DAVID E. CHILDS, et al., | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS. | ) | |

CHARACTER OF PROCEEDINGS:      Civil Appeal from the Court of Common
                               Pleas of Columbiana County, Ohio
                               Case No. 2013CV293

JUDGMENT                       Reversed and Vacated in part, Affirmed
                               in part.

APPEARANCES:

For Plaintiff-Appellee:        Atty. Christopher Kuhn
                               Atty. Robert Pivonka
                               Rolf Goffman Martin Lang, LLP
                               30100 Chagrin Boulevard, Suite 350
                               Cleveland, Ohio 44124


For Defendants-Appellants:     Atty. G. Brenda Coey
                               Bonezzi Switzer Pliti & Hupp Co. L.P.A.
                               1300 East 9th Street, Suite 1950
                               Cleveland, Ohio  44114

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

                               Dated:  November 18, 2016

ROBB, J.

**{¶1}** Defendants-Appellants David E. Childs, Management Services Company, and Brewster Parke, Inc. appeal the judgment entered against them in the Columbiana County Common Pleas Court after a jury found in favor of Plaintiff-Appellee Premier Therapy, LLC. Appellants first contend the court erred in requiring them to share three peremptory challenges with another defendant.

**{¶2}** Appellants next argue they were entitled to directed verdict on the issue of piercing the veil of Holander House, Ltd., claiming: the veil of a limited liability company cannot be pierced; the doctrine cannot be applied to reach a person who is not a member of the limited liability company; and there was insufficient evidence of Appellants' control of Holander House to establish the alter-ego prong of piercing.

**{¶3}** Appellants' third assignment of error sets forth multiple arguments on the fraudulent transfer and civil conspiracy claims and the damages awarded thereon. As to the transfer of Holander House's realty to Brewster Parke, they argue the real estate does not qualify as an asset under the uniform fraudulent transfer act as it was fully encumbered by a mortgage. They alternatively contend a reasonably equivalent value was provided when Brewster Parke took out a second mortgage on its own property to appease the bank, who was contemplating foreclosure on Holander House.

**{¶4}** As the transfer of the realty was considered in conjunction with the later sale of the realty and business assets (bed licenses) of Holander House, Appellants argue they never possessed the bed licenses in order to commit a fraudulent transfer. They further assert the transferee of the business assets (also a subsequent transferee of the real estate) was a necessary party.

**{¶5}** Regarding damages, Appellants argue the jury's award on the fraudulent transfer claim was against the weight of the evidence concerning the fair market value of Holander House. As to the conspiracy claim, Appellants urge there was no evidence as to the additional award, which was based solely on closing arguments.

**{¶6}** In their final assignment of error, Appellants argue the trial court should not have considered fees for the expert witness who testified at trial in the current action or attorneys' fees incurred in a voluntarily dismissed action that was later refiled as the current action.

**{¶7}** For the following reasons, a portion of the damage award in the amount of $100,847.88 is reversed and vacated. We also hold the doctrine of veil piercing cannot be applied to Brewster Parke, Inc., who remains liable for fraudulent transfer and civil conspiracy. The remainder of the judgment is affirmed.

## STATEMENT OF THE CASE

**{¶8}** Premier Therapy provided services to patients at Holander House, Ltd., a nursing home in Salem, Ohio. In 2007 and 2008, Holander House failed to pay Premier Therapy, even after Holander House received reimbursement for those services from insurance providers, including Medicare. On February 27, 2009, Premier Therapy filed suit against Holander House. In August 2009, Premier Therapy filed a motion for summary judgment. Holander House sought additional time to conduct discovery, but within weeks, their attorney (who also represented Appellants) withdrew from the case. In December 2009, Premier Therapy obtained judgment against Holander House for nearly $600,000.

**{¶9}** Attempting to collect on the judgment, Premier Therapy learned there were no assets remaining due to various transactions involving Appellants and the former owners of Holander House. At the time the services were rendered by Premier Therapy, the owners of Holander House were Mr. Childs' daughter, Caroline Childs Hergenrother, and Mr. Childs' son-in-law, Kurt Hergenrother.

**{¶10}** The Hergenrothers formed Holander House, Ltd. in 2002, after they purchased the former Salem Convalescent Center. This center had been operated by Mr. Childs as the executor of the estate of his mother, Mildred Arfman. Marsha Arfman (the half-sister of Mr. Childs) was the beneficiary of the estate. The Hergenrothers' purchase of the nursing home was funded by a loan of $2.163 million from Unizan Bank secured by a first mortgage and a $500,000 loan from Marsha

Arfman secured by a second mortgage. Mr. Childs co-signed the bank loan for the Holander House; he also guaranteed the loan from Marsha Arfman.

{¶11} Mr. Childs was the president and controlling shareholder of Brewster Parke, Inc., another company that owned a senior living facility. Management Services Company was a sole proprietorship owned by Mr. Childs; it provided payroll and accounting services to Holander House, Brewster Parke, and Bel-Air (a sole proprietorship nursing home owned by Mr. Childs). (Tr. 598, 1287). In 2007 and 2008, Mr. Childs and/or Brewster Parke, Inc. provided various loans to Holander House to cover operating expenses. (Tr. 598-608, 1289). At one point, Brewster Parke wrote checks to Holander House employees. (Tr. 1291).

{¶12} Due to various issues including bounced checks and failure to provide financial statements, the bank contacted Mr. Childs. In December 2008, Mr. Childs voiced in a letter that his daughter was no longer fiscally operating the facility but had turned responsibility over to her husband. Mr. Childs said he would be willing to assist Holander House only if he gained control of the assets. He expressed a belief the business was worth more than $2.4 million.

{¶13} On April 28, 2009, Brewster Parke signed a commercial guarantee and granted the bank a (second) mortgage on its own property as additional collateral for the Holander House loan to satisfy the bank's concerns about the condition of Holander House. (Tr. 651, 792, 828-830, 860). At that time, Holander House deeded its real estate to Brewster Parke, Inc. without a written agreement or consideration; the transfer was recorded on May 8, 2009. (Tr. 662); (Pl. Ex. 42-43). The balance on the note secured by the mortgage was over $1.7 million; Holander House remained liable on the note held by the bank. (Tr. 654, 805, 888). Thereafter, Marsha Arfman released the second mortgage on the Holander House real estate, even though it was never repaid. (Tr. 568); (Pl. Ex. 20). In return, Mr. Childs, as president of Brewster Parke, Inc., provided his half-sister with two $250,000 promissory notes.

{¶14} Although the real estate was transferred to Brewster Parke, Inc., ownership of the bed licenses remained with Holander House. In June 2009, an

agreement to sell the realty and the bed licenses was entered with an unrelated entity, and the sale was finalized in September 2009. The real estate sold for $1.7 million, and the bed licenses sold for $500,000, for a total purchase price of $2.2 million. (Pl. Ex. 61); (Tr. 872). Premier Therapy argued this sale was more than $600,000 below market value.

{¶15} In July 2011, Premier Therapy filed suit against the Hergenrothers and the three Appellants herein: Mr. Childs, Management Services Company, and Brewster Parke, Inc. The action was voluntarily dismissed. According to Premier Therapy, the decision to dismiss the case was prompted by its discovery of communications between Appellants' law firm and Huntington National Bank, successor by merger to Unizan Bank.

{¶16} Premier Therapy refiled the action in May 2013, suing the three Appellants, the bank (Huntington National Bank and Huntington Bancshares dba Huntington National Bank), and the law firm who previously represented Appellants and the Holander House (Buckingham Doolittle Burroughs, LLP). As to Appellants, Premier Therapy alleged fraudulent transfer (of Holander House assets), unjust enrichment, and conspiracy to commit fraud. The complaint also asked to pierce the corporate veil to hold Appellants liable for the debts Holander House owed to Premier Therapy.

{¶17} The bank and the law firm were named as defendants for conspiracy to commit fraud. (The complaint also contained a claim for aiding and abetting a fraudulent transfer, but the court found there was no such cause of action.) The trial court overruled motions for summary judgment filed by the three sets of defendants (Appellants, the bank, and the law firm). Just prior to trial, Premier Therapy dismissed its case against the law firm due to settlement. The case was tried to a jury over the course of seven days. During trial, directed verdict was granted in favor of the bank.

{¶18} Premier Therapy withdrew the unjust enrichment claim. The jury returned a unanimous verdict in favor of Premier Therapy and against Appellants on the claims of fraudulent transfer and civil conspiracy in the amount $693,776.60. In

the general verdict, the jury also found the veil of Holander House could be pierced to reach Appellants. Upon resuming deliberations on bifurcated issues, the jury awarded $10,000 in punitive damages and allowed attorneys' fees.

**{¶19}** The trial court entered judgment on the verdict on November 26, 2014. Appellants filed a motion for new trial and judgment notwithstanding the verdict. When this was denied, they filed an appeal from the judgment, resulting in 14 CO 0048. The case was remanded by this court in order for the trial court to rule on the amount of attorneys' fees. On October 5, 2015, the trial court issued its decision awarding Premier Therapy $306,600.20 in fees. The appeal of that judgment resulted in 15 CO 0028. The appeals were consolidated.

ASSIGNMENT OF ERROR ONE: PEREMPTORY CHALLENGES

**{¶20}** Appellant's first assignment of error contends:

"THE TRIAL COURT ERRED IN DENYING THE APPELLANTS THEIR RIGHT TO THREE PEREMPTORY CHALLENGES AS SET FORTH IN CIVIL RULE 47."

**{¶21}** Civ.R. 47(C) provides: "In addition to challenges for cause provided by law, each party peremptorily may challenge three prospective jurors. If the interests of multiple litigants are essentially the same, 'each party' shall mean 'each side.' * * * "

**{¶22}** At the beginning of the trial proceedings, the court placed on the record a decision made during a telephone conference with the parties. The court ruled that each side would receive three peremptory challenges while seating the eight-person jury because there were no cross-claims between the defendants. (Tr. 5). Each side would also receive two peremptory challenges for the three alternates to be seated. (Tr. 5-6). Premier Therapy voiced no opinion on the topic.

**{¶23}** The bank objected and sought its own three peremptory challenges, pointing to the separate answers and different attorneys. The bank urged the defenses did not "rise and fall together" as only the conspiracy claim was brought against them. (Tr. 6). Appellants likewise objected to sharing three peremptory challenges with the bank. They generally argued they were "not similarly aligned"

with the bank. (Tr. 8). (They concede the court properly grouped the three Appellants {Mr. Childs, Brewster Parke, Inc., and Management Services Company} as one party under the rule.)

{¶24} As to procedure, the court said the objection would be a standing or continuing objection and counsel need not object "each and every time in front of the jury." The bank said its objection would be to the notion that any challenge exercised by Appellants was on the bank's behalf. (Tr. 7). The court answered that if the bank chose not to confer with Appellants on the peremptory challenge, they could alternate the challenges with Appellants going first. (Tr. 7-8). Appellants' counsel said:

> The point that [the bank's attorney] made with respect to the actual use of the peremptory I agree with, Your Honor, that a standing objection makes the most sense. When he does object, we will not be discussing it with him and obviously we object to any challenge that he issues, but we acknowledge that the standing objection that you noted makes sense and we don't need to discuss it in front of the jury. (Tr. 8-9).

{¶25} During jury selection, Premier Therapy used its three peremptory challenges. (Tr. 116-117, 137-138). On the defense side, Appellants used the first peremptory challenge, the bank used the second peremptory challenge, and Appellants used the third peremptory challenge. (Tr. 116-117, 137-138). At that point, the court announced, "we have our trial jury[.]"

{¶26} Three alternates were then chosen. Although no alternate ended up serving as a juror, we note the challenges at this stage: Appellants successfully challenged an alternate for cause; Premier Therapy exercised no peremptory challenges; the bank exercised a peremptory challenge; and Appellants declined to exercise a peremptory challenge as to the alternates. (Tr. 150-154). The court announced the seating of the trial jury and the alternates.

{¶27} Appellants argue the court erred in denying them three peremptory challenges; essentially, they contend they were denied one peremptory challenge. Appellants urge they should not have been considered the "same side" as the bank

because not all claims against the defense rose and fell together, citing the Ohio Supreme Court's *Le Fort* case and various appellate cases. They note the bank was represented by separate counsel, filed a separate answer, and filed a separate summary judgment motion. Appellants also ask us to consider the ultimate outcome: the bank received a directed verdict, but the case against Appellants was submitted to the jury.

{¶28} Premier Therapy responds by arguing the parties' interests were not "essentially different or antagonistic" and thus they were "essentially the same" as per Civ.R. 47(C) and the Supreme Court's *Le Fort* case. Although the case against the bank was for conspiracy to commit a fraudulent transfer, it was in the bank's interest to defeat the underlying fraudulent transfer claim filed by Premier Therapy against Appellants. Premier Therapy says the trial court had discretion in determining whether the bank should be considered the same side as Appellants under the rule. Under an abuse of discretion standard, cases affirming a decision to allow more than one set of challenges to the defense do not require an appellate court to reverse when only one set of challenges is allowed.

{¶29} Premier Therapy alternatively argues that even if there was error, prejudice is not apparent. For instance, there was a unanimous eight-person verdict when only six votes were needed. Premier Therapy also notes the protections in a civil case differ from a criminal case. *See* Crim.R. 24(D) ("If there is more than one defendant, each defendant peremptorily may challenge the same number of prospective jurors as if the defendant was the sole defendant.").

{¶30} Premier Therapy next claims Appellants were required to proffer on the record a third strike (and who they would have struck) at the time the court announced the jury had been chosen. Appellants' initial objection dealt with the decision the defense side would share peremptory challenges; the standing objection served as Appellants' objection to the bank's use of the second challenge. At the time the standing objection was made, it could not be ascertained whether Appellants needed a third peremptory challenge. Thus, Premier Therapy urges Appellants were required to proffer for the record, at the time the court closed the challenges, that

they would have exercised the one challenge they claim to have been denied. Appellants reply by arguing the standing objection was sufficient to preserve the issue for appeal. They claim that, upon demonstrating they exercised all peremptory challenges granted to them, they are not required to show prejudice.

{¶31} In *LeFort*, the plaintiff argued the trial court violated Civ.R. 47 in ordering the following allocation of peremptory challenges: three challenges to each of the four corporate defendants; three to be shared by two agents of a defendant; and three to the agent of another defendant. *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 512 N.E.2d 640 (1987). The parties' subsequent exercise of peremptory challenges was as follows: the plaintiffs exercised two of their three challenges; one defendant used no challenges, and its two agents used none of their three challenges; another defendant used one challenge, and its agent used one; and the other two corporate defendants used two challenges each. *LeFort v. Century 21-Maitland Realty Co.*, 8th Dist. No. 50262 (Apr. 10, 1986), fn. 2.

{¶32} In setting forth the premise of Civ.R. 47, the Supreme Court stated: "those who have identical interests or defenses are to be considered one party and therefore only collectively entitled to the number of challenges allowed to one party * * *." *LeFort*, 32 Ohio St.3d at 125, quoting *Chakeres v. Merchants & Mechanics Fed. S. & L. Assn.*, 117 Ohio App. 351, 355, 192 N.E.2d 323 (1962). "However, if the interests of the parties defendant are essentially different or antagonistic, each litigant is ordinarily deemed a party within the contemplation of the statute and entitled to the full number of peremptory challenges." *Id.*

{¶33} The Court summarized the facts: each defendant filed separate replies and defenses; each was represented by its own counsel; one defendant and its agent filed a separate motion for partial summary judgment on duty; each defendant could attempt to prove its conduct did not constitute negligent misrepresentation; and each defendant asserted allegations which, if proved, would absolve it from liability to the detriment of the others. *Id.* We add that one of the defendants and its agent filed a cross-claim against the other defendants. *LeFort*, 8th Dist. No. 50262.

**{¶34}** The Supreme Court found each defendant was entitled to three peremptory challenges because "the defenses asserted did not necessarily stand or fall together." *LeFort*, 32 Ohio St.3d at 125. The Court further concluded the plaintiffs were not prejudiced by the separate peremptory challenges granted to the agents because no corporate defendant together with its agent(s) actually exercised more than three peremptory challenges. *Id.*

**{¶35}** This case and other cases Appellants cite involve the trial court granting each defendant a set of peremptory challenges and the reviewing court affirming that decision. *See, e.g., id.; Mitchell v. Columbiana Cty. Mental Health Ctr.*, 7th Dist. No. 00 CO 46, 2001-Ohio-3472 (medical malpractice complaint alleged different negligent acts at different appointments with different doctors; defendants each filed answer alleging other was proximate cause; separate attorneys filed separate summary judgment motions; strategy was to pit the opinion of one defendant against the opinion of another; and the jury could have found any defendant liable to exclusion of the others). *See also Reitz v. Howlett*, 106 Ohio App.3d 409, 419, 666 N.E.2d 296 (9th Dist.1995). The case at bar involves the trial court's decision that Appellants would share their peremptory challenges with the bank.

**{¶36}** "A determination of whether or not the interests of multiple litigants are the same is a matter left to the discretion of the trial court." *Davis v. Immediate Med. Services, Inc.*, 5th Dist. No. 94 CA 0253 (Dec. 12, 1995) (upholding the trial court's decision that defense interests were antagonistic where the defendants were represented by different law firms and insurance carriers and the members of one set of appellees agreed to call an expert who would testify the other set of appellees breached the standard of care).[1] *See also Huth v. Shubert*, 5th Dist. No. CA-9062 (June 21, 1993) (no abuse of discretion in finding the defendants' interests were different).

**{¶37}** "Where a trial court is vested with such authority, reversal on appeal is justified only if its exercise thereof constitutes an abuse of discretion." *Berk v.*

---

[1] The *Davis* case was affirmed in part and reversed in part by the Ohio Supreme Court in 80 Ohio St.3d 10, 684 N.E.2d 292 (1997). However, the peremptory challenge issue was not reviewed in the Supreme Court appeal.

*Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990) (in ruling on a challenge for cause). An abuse of discretion is more than an error of law or of judgment; it implies the trial court's attitude was unreasonable, arbitrary or unconscionable. *Id.* When applying this standard, an appellate court is not free to substitute its judgment for that of the trial judge. *Id.*

**{¶38}** Appellants believe a mistake in allocating peremptory challenges is prejudicial per se. They acknowledge courts consider a lack of prejudice where the appellant did not use all allotted peremptory challenges. *See State v. Greer*, 39 Ohio St.3d 236, 245, 530 N.E.2d 382 (1988) ("appellant utilized only five of the six peremptory challenges granted, and is therefore unable to demonstrate actual prejudice."); *Formis v. Calabrese*, 7th Dist. No. 1278 (Mar. 7, 1979) ("We do not see how defendants could be prejudiced by the ruling of the trial court" making defendants share peremptory challenges where they exercised one peremptory challenges and twice refused further opportunities to exercise their right to peremptory challenges).

**{¶39}** By exercising two challenges, Appellants utilized all allocated challenges. (The bank utilized the remaining challenge allocated to the defense "side" of the case.) Appellants conclude that upon their full exercise of allotted challenges, reversal is automatic.

**{¶40}** There are few instances where a party need not show an error was prejudicial in order to prevail. For examples, structural error is reversible per se, but applies to "a very limited class of errors" where the fairness of a proceeding as a whole is undermined by a constitutional error. *United States v. Davila*, __ U.S. __, 133 S.Ct. 2139, 2149, 186 L.Ed.2d 139 (2013). *See also Washington v. Recuenco*, 548 U.S. 212, 218, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006), fn. 2. There is no constitutional right to peremptory challenges. *See, e.g., United States v. Martinez–Salazar*, 528 U.S. 304, 311, 313, 317, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (peremptory challenges are auxiliary; "unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension"); *Greer*, 39 Ohio St.3d at 245.

**{¶41}** The use of peremptory challenges in federal court is governed by statute. "In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly." 28 U.S.C.A. 1870. It has been suggested that to show prejudice, the party complaining about the denial of peremptory challenges must make a record to show he was dissatisfied with a juror finally selected or he wished to select another: "before a reversal is granted, the complaining party should be able to point [to] some convincing indication in the record that if a further peremptory challenge had been allowed, he meant to challenge one or more jurors." *Goldstein v. Kelleher*, 728 F.2d 32, 38 (1st Cir.1984) (although the trial court abused its discretion in allocating challenges, the complainant must indicate *the jury selected* was unsatisfactory), applying Fed.R.Civ.P. 61 (instructing the court to disregard any error or defect which does not affect a substantial right).

**{¶42}** In a criminal case, the United States Supreme Court ruled the denial of a peremptory challenge is not prejudicial per se under federal law. *Rivera v. Illinois*, 556 U.S. 148, 158-161, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009) (disavowing the dicta in *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) that a peremptory challenge mistake is reversible per se)*. See also Martinez–Salazar*, 528 U.S. at 317 (right to peremptory challenge is not impaired where the defendant must use one to cure error in denying a challenge for cause). The United States Supreme Court left to the states the question of prejudice from the denial of a peremptory challenge and affirmed the Illinois Supreme Court's holding of harmless error. *Rivera*, 556 U.S. at 162.

**{¶43}** In *Greer*, a capital defendant argued to the Ohio Supreme Court "that he was denied the right to the lawful number of peremptory challenges and that such denial is reversible error without any demonstration of prejudice." *Greer*, 39 Ohio St.3d at 244-245. The trial court provided 6 peremptory challenges for a capital defendant as per Crim.R. 24; however, a statute provided for 12 peremptory

challenges for a capital defendant. As the trial court agreed to provide 12 challenges if the defendant amended his petition, which sought 24 (12 for each offense), the Ohio Supreme Court found no error (due to the defendant's refusal to amend his petition). The Court also found no prejudice due to the use of only five peremptory challenges. *Id.* at 245.

{¶44} Nevertheless, the Court continued its analysis in order to address the conflict between the rule and the statute on the number of challenges to which a capital defendant is entitled, concluding the rule prevailed over the statute. *Id.* at 246. The Court explained a peremptory challenge is a substantive right once it is provided by the legislature via statute, "but the same cannot be stated with regard to the number of peremptory challenges allowed." *Id.* ("the allowable number of peremptory challenges is a matter of procedure"). "The number of allowable peremptory challenges has, with near unanimity, been declared a matter of procedure, 'subject to * * * discretion * * * and var[ying] from jurisdiction to jurisdiction.' " *Id.* at 246

{¶45} The Eighth District once reviewed a case where the defendant complained the plaintiff was permitted to exercise five peremptory challenges and concluded: "We have reviewed the record and have determined that the plaintiff was allowed to exercise two peremptory challenges in excess of those allowed. This was error and was brought to the trial court's attention. However, upon our review of all of the evidence, we do not conclude that the appellant was prejudiced thereby." *Associated Estates Corp. v. Smith*, 8th Dist. No. 46054 (Oct. 4, 1984). Finally, there are the applicable enactments on the subject of prejudice.

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of

the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Civ.R. 61. Similarly, R.C. 2309.59 provides:

In every stage of an action, the court shall disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party. No final judgment or decree shall be reversed or affected by reason of such error or defect. In the judgment of any reviewing court upon any appeal in any civil action, * * * If the reviewing court determines and certifies that, in its opinion, substantial justice has been done to the party complaining as shown by the record, all alleged errors or defects occurring at the trial shall be deemed not prejudicial to the party complaining and shall be disregarded * * *."

**{¶46}** We conclude the decision of whether the parties on one side have antagonistic interests or aligned interests is a discretionary decision for the trial court. In reviewing that discretion, we consider the totality of the circumstances and the arguments before the trial court.

**{¶47}** On the one hand, Appellants and the bank were represented by separate counsel. As a result, separate answers and summary judgment motions were filed. Appellants point out the bank was granted directed verdict during trial, but the case against them was submitted to the jury. Although courts have mentioned the trial proceedings in upholding a trial court's allocation of challenges to more than one defendant, the trial court makes its decision prior to trial, without the benefit of foresight as to what is to transpire. The task is to evaluate the nature and defenses of each defendant-group as presented to the court at the time of its ruling, which involves a general review of the status of the litigation prior to trial. *Brown v. Martin*, 5th Dist. No. 14-CA-31, 2015-Ohio-503, ¶ 15.

**{¶48}** As the trial court pointed out, there were no cross-claims. A cross-claim is the formalization of antagonistic interests. The lack of a cross-claim is not dispositive of the question, but it can be a consideration in evaluating the totality of

the circumstances. *See Formis*, 7th Dist. No. 1278. The complaint alleged Appellant and the bank conspired together to engage in a fraudulent transfer. Although, the fraudulent transfer claim was brought only against Appellants, that claim encompassed the underlying transfer utilized in the conspiracy claim.

**{¶49}** The answers raised many of the same defenses, including failure to join a necessary party, jurisdiction, lack of standing or real party in interest, frivolous lawsuit, and statute of limitations. The summary judgment motions raised many of the same arguments as well. In fact, the bank argued in favor of Appellants on the fraudulent transfer claim, contending the real estate was not covered by the fraudulent transfer statutes. Both Appellants and the bank argued there was no underlying wrongful act for the conspiracy. The trial court issued a thirty-page ruling on the summary judgment motions and was familiar with the parties' legal arguments at that stage of the proceedings.

**{¶50}** Unlike certain cited medical malpractice cases, the defendants here did not blame the plaintiff's injury on each other and/or the plaintiff did not appear to have a strategy of pitting one defendant against the other. *Compare Mitchell*, 7th Dist. No. 00 CO 46. If Appellants were relieved of liability, then the claim against the bank would also fail. Likewise, Appellants had no reason to argue for the bank's liability; such scenario could only harm Appellants because if the bank was liable, then so were they.

**{¶51}** In *Le Fort*, the Supreme Court concluded: "Each defendant asserted allegations which, if proved, would absolve it from liability to the detriment of the others. In sum, the defenses asserted did not necessarily stand or fall together." *LeFort*, 32 Ohio St.3d at 125. Here, absolving the bank of liability was not to the detriment of Appellants. Although Appellants had additional concerns and could suffer liability even if the jury found no conspiracy with the bank, this did not necessarily render the interests antagonistic.

**{¶52}** In arguing against the trial court's decision prior to jury selection, Appellants generally proclaimed their interests were not similarly aligned. Whether a

more detailed argument was set forth during the telephone conference where the matter was first raised is unknown.

{¶53} Under the totality of the circumstances, this court concludes it was not unreasonable or unconscionable for the trial court to find the parties' interests were not essentially antagonistic. *See LeFort*, 32 Ohio St.3d at 125 (where the interests are "essentially different or antagonistic," defendants are "ordinarily" deemed separate parties). We emphasize that the cases upholding a trial judge's decision to grant separate peremptory challenges to defendants do not require the reversal of a trial judge's decision that one side will share peremptory challenges. Although a different judge may have reasonably made a different decision, where the decision is in the discretionary province of the trial court, we cannot substitute our judgment. *See, e.g., Berk*, 53 Ohio St.3d at 169; *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶54} Even assuming arguendo Appellants were entitled to their own set of peremptory challenges, we also conclude Appellants failed to show prejudice. They exercised two peremptory challenges on either side of the one exercised by the bank. Their appeal involves their receipt of two challenges (with the third challenge being utilized by another defendant), as opposed to the three challenges granted to the plaintiff. This case is distinguishable from the situation where there is a large disparity in peremptory challenges due to an erroneous allocation decision by the trial court. As Premier Therapy further points out, this was an eight-person civil jury who rendered a unanimous decision, and they only needed six jurors to vote in their favor.

{¶55} There was a standing objection to the court's decision, but this appeared to be an objection to the bank's use of the second challenge for the defense side or the general decision on sharing the peremptory challenges. Although Appellants used the two allotted challenges and the bank used the third challenge, there is no indication Appellants would have used another challenge after Premier Therapy used its third challenge. Nothing was proffered on the record. This court concludes Appellants' substantial rights were not affected by the trial court's allocation of peremptory challenges. The refusal to set aside the jury verdict based

on this issue alone would be consistent with substantial justice. *See* Civ.R. 61; R.C. 2309.59. On all these bases, this assignment of error is overruled.

<u>ASSIGNMENT OF ERROR TWO: VEIL PIERCING</u>

**{¶56}** Appellants' second assignment of error contends:

"THE TRIAL COURT ERRED IN FAILING TO AWARD SUMMARY JUDGMENT AND/OR DIRECTED VERDICT TO THE APPELLANTS ON THE PLAINTIFF'S PIERCING THE CORPORATE VEIL CLAIM AS PIERCING THE CORPORATE VEIL IS NOT PROPER TO AN LLC, PIERCING THE CORPORATE VEIL CANNOT APPLY TO A NON-MEMBER/NON-SHAREHOLDER AND/OR PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE TO ESTABLISH PIERCING OF THE CORPORATE VEIL."

**{¶57}** "A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993). The general rule is that these corporate actors are not held personally liable for acts of the corporation *merely* by reason of their relationship to the corporation. Yet, they are not absolutely immune. *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 17.

**{¶58}** One exception to the general limited liability rule allows the corporate form to be disregarded and the corporate veil pierced in order to reach the assets of the corporation's individual shareholders. *Belvedere*, 67 Ohio St.3d at 287. Piercing the veil is considered a rare exception, with limited liability for shareholders being the rule. *Dombroski,* 119 Ohio St.3d 506 at ¶ 26. The purpose of holding an individual shareholder liable for certain corporate misdeeds is because "it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." *Belvedere*, 67 Ohio St.3d at 287.

**{¶59}** There are three mandatory elements to pierce the corporate veil: (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; (2) the control by those to be held liable was exercised in such a manner as to commit fraud, an illegal

act, or a similarly unlawful act; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Dombroski,* 119 Ohio St.3d 506 at ¶ 18, 27, 29 (adding "similarly unlawful act" to the second prong), modifying *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 617 N.E.2d 1075 (1993).

**{¶60}** When determining whether to pierce the corporate veil, each case is viewed sui generis, on its own facts. *State ex rel. DeWine v. S & R Recycling, Inc.*, 195 Ohio App.3d 744, 2011-Ohio-3371, 961 N.E.2d 1153, ¶ 29 (7th Dist.). Appellate review of a decision to pierce the corporate veil typically entails a review of whether competent, credible evidence supports the fact-finder's decision. *Id.*

**{¶61}** However, Appellants are appealing the trial court's decision to allow the case to be submitted to the jury after they moved for directed verdict. The trial court can only grant a motion for directed verdict if, "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4).

**{¶62}** This rule requires the court to ascertain "only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3. Although the court must review and consider the evidence, a directed verdict motion presents a question of law rather than a factual issue. *Id.* at ¶ 4. In accordance, the standard of review of the trial court's denial of the motion for directed verdict is de novo. *Id.*[2]

### Piercing Argument A: Doctrine applicable to LLC

**{¶63}** Appellants make three arguments with regards to veil piercing. First, Appellants contend the doctrine of veil piercing does not exist to pierce the veil of a

---

[2] Appellants add a parallel argument that the trial court erred in denying summary judgment on the topic of veil piercing. An error in denying of summary judgment is moot and not reviewable after a trial on merits where the final judgment is not contrary to the manifest weight of the evidence, at least to the extent the motion involved whether there were disputed facts. *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 156-159, 642 N.E.2d 615 (1994). To the extent the motion was based upon pure legal principles, these legal principles are being addressed on appeal within the argument that the court erred in failing to grant directed verdict. In any event, Appellants present the same analysis as to each motion.

limited liability company, suggesting the doctrine is reserved for corporations. Because Holander House was a limited liability company, Appellants argue veil piercing is inapplicable. They rely on R.C. 1705.48(B), which provides:

> Neither the members of the limited liability company nor any managers of the limited liability company are personally liable to satisfy any judgment, decree, or order of a court for, or are personally liable to satisfy in any other manner, a debt, obligation, or liability of the company solely by reason of being a member or manager of the limited liability company.

*See* R.C. 1705.48(B). *Compare* R.C. 1705.48(D) ("Nothing in this chapter affects any personal liability of a member of a limited liability company or any manager of a limited liability company for the member's or manager's own actions or omissions.")

**{¶64}** After recognizing R.C. 1705.48(B), the First District held: "Members of a limited liability company may only be reached individually if the plaintiff demonstrates that the behavior of the members merits disregarding, or piercing, the entity's limited liability structure." *Huttenbauer Land Co. v. Harley Riley, Ltd.*, 1st Dist. No. C-110842, 2012-Ohio-4585, ¶ 15. The Second District adopted this holding after the appellant cited R.C. 1705.48(B). *Acquisition Servs., Inc. v. Zeller*, 2d Dist. No. 25486, 2013-Ohio-3455, ¶ 45. The Eighth District introduced the three *Belvedere* elements by stating: "Generally, in order to disregard the protections afforded by corporate *or limited-liability business forms*, one must show * * *." (Emphasis added). *Ossco Properties, Ltd. v. United Commercial Property Group, L.L.C.*, 197 Ohio App.3d 623, 2011-Ohio-6759, 968 N.E.2d 535, ¶ 22.

**{¶65}** Appellate districts throughout the state regularly apply the veil piercing doctrine to limited liability companies. *See, e.g., Auto Sale, L.L.C. v. Am. Auto Credit, L.L.C.,* 8th Dist. No. 102438, 2015-Ohio-4763, ¶ 21 (assuming veil piercing could apply to LLC where proven); *DiBlasio v. Sinclair*, 7th Dist. No. 08-MA-23, 2012-Ohio-5848, ¶ 26 (proceeding under premise that doctrine applied to both corporation and limited liability company); *RCO Internatl. Corp. v. Clevenger*, 180 Ohio App.3d

211, 214, 2008-Ohio-6823, 904 N.E.2d 941, ¶ 4, 9-12 (10th Dist.). *See also Siva v. 1138 LLC*, 10th Dist. No. 06AP-959, 2007-Ohio-4667, ¶ 12 (finding the decision to pierce the veil of the limited liability company was not contrary to the weight of the evidence after ruling a party waived a R.C. 1705.48(B) argument). In advising that control alone is not sufficient to pierce the veil, courts have noted "to find that such a scheme creates an automatic right to pierce the corporate veil would virtually undo all small businesses functioning as LLCs or Sub-Chapter S Corporations." *See, e.g., ERB Poultry, Inc. v. CEME, L.L.C.*, 2d Dist. No. 26074, 2014-Ohio-4504, 20 N.E.3d 1228, ¶ 19 (citing cases).

{¶66} A limited liability company has even been described as an example of a "corporate entity." *See, e.g., Megaland GP, L.L.C. v. Franklin Cty. Bd. of Revision*, 145 Ohio St.3d 84, 2015-Ohio-4918, 47 N.E.3d 117, fn. 2. A limited liability company is a legal fiction, as is a corporation.

> That a corporation is a legal entity, apart from the natural persons who compose it, is a mere fiction, introduced for convenience in the transaction of its business, and of those who do business with it; *but like every other fiction of the law*, when urged to an intent and purpose not within its reason and policy, may be disregarded.

(Emphasis added.) *Belvedere*, 67 Ohio St.3d at 287, quoting *State ex rel. Atty. Gen. v. Standard Oil Co.*, 49 Ohio St. 137, 30 N.E. 279 (1892), paragraph one of the syllabus.

{¶67} Furthermore, there exists a statute applicable to corporations which is similar to the cited provision in R.C. 1705.48. R.C. 1701.18, partly entitled, "liability of shareholders," provides:

> (J) Except as set forth in any provision in Title LVII of the Revised Code, neither a shareholder of a corporation nor a subscriber to its shares is personally liable for any debts, obligations, or liabilities of the corporation in the absence of a written, enforceable agreement that is

signed by the shareholder or subscriber and that specifically undertakes liability for such debts, obligations, or liabilities.

R.C. 1701.18(J). *See also* Section 3, Article XIII, Ohio Constitution; R.C. 1702.55 (a similar statute governing non-profit corporations).

**{¶68}** This is a restatement of the fundamental rule of corporate law, and veil piercing is a well-established exception. *See Holian v. Lawn Village, Inc.*, 8th Dist. No. 87543, 2006-Ohio-5027, ¶ 33-34, citing R.C. 1701.18. That is, notwithstanding this statutory provision on limited liability for shareholders of a corporation, the Supreme Court recognizes the doctrine of piercing the corporate veil.

**{¶69}** Finally, R.C. 1705.48(B) merely says the member will not be liable "solely" due to their status as a member. Piercing is not imposed solely due to such status but due to the elements in *Belvedere*. For all of these reasons, Appellants' argument that the limited liability company statute disallows veil piercing lacks merit; a limited liability company is subject to the same veil piercing test as a corporation.

<u>Piercing Argument B: Appellants are not registered LLC members</u>

**{¶70}** Appellants' alternative argument is that veil piercing can only reach individual members of the limited liability company. Appellants claim the Hergenrothers were the only members of Holander House, Ltd., the limited liability company whose veil was pierced. The argument here is not that Appellants did not exercise sufficient control of Holander House; sufficiency of the evidence on control is the third argument presented infra. Rather, the argument can be phrased: as a matter of law, the veil of a limited liability company can never be pierced to reach those whose name does not appear on the records of the limited liability company as the owner of a membership interest in that company. In other words, Appellants say piercing only applies to "a person whose name appears on the records of the limited liability company as the owner of a membership interest in that company." *See* R.C. 1705.01 (defining a member of a limited liability company). *See also* R.C. 1701.01(F) (defining a shareholder as "a person whose name appears on the books of the corporation as the owner of shares of the corporation").

**{¶71}** Appellants read into the *Belvedere* test a fourth element: the person to be held liable is a shareholder (in the case of a corporation) or a member (in the case of a limited liability company). They note that *Belvedere* spoke of recovery from "an individual shareholder." *Belvedere*, 67 Ohio St.3d at 287. Yet, that was the fact pattern before the court: allegations of a shareholder acting as the alter-ego. The Court was not faced with the situation where a person liable on a note allegedly took over the company to sell the assets in order to ensure his personal obligations were satisfied. In addition, *Belvedere* initially set forth the general rule as applying to "shareholders, officers, and directors." *Id.*

**{¶72}** Appellants also cite the *Allen* and *Longazel* cases. In making alternative holdings, the Sixth District stated an individual cannot be held liable through veil piercing if there is no evidence indicating the individual's shareholder status. *City of Toledo v. Allen*, 6th Dist. No. L-04-1237, 2005-Ohio-1781, ¶ 54 (finding a complete lack of evidence as to who owned shares in the corporation to be pierced). Premier Therapy notes the statement in *Allen* was prefaced with a holding that the corporation sought to be pierced was not the owner of the subject property in a nuisance action and "it logically follows that Allen cannot be held responsible as an owner or shareholder of [the corporation]." *Id.*

**{¶73}** Prior to finding a shareholder was not liable under the piercing doctrine, the Eighth District said the shareholder's wife and the trustee of a trust (which made distributions after receiving money from the corporation) could not be held liable under piercing because they were not shareholders of the corporation. *Arrow Uniform Rental, L.P. v. Longazel*, 8th Dist. No. 91536, 2009-Ohio-868, ¶ 55. In *Longazel*, there was no control over the corporation by the shareholder's wife or trustee.

**{¶74}** Premier Therapy points out the piercing doctrine is less concerned with form and more concerned with the reality of how the corporation operated and the individual defendant's relationship to that operation. *See State ex rel. DeWine v. S & R Recycling, Inc.*, 195 Ohio App.3d 744, 2011-Ohio-3371, 961 N.E.2d 1153, ¶ 31 (7th Dist.). Premier Therapy relies on the Tenth District's *Sanderson* case.

**{¶75}** In that case, there was evidence the appellant exercised significant control over the corporation, performed a substantial amount of work on behalf of the corporation, could veto extraordinary purchases, and took assets from the corporation and gave them to or funneled them through his other corporation. *Sanderson Farms, Inc. v. Gasbarro*, 10th Dist. No. 01AP-461, 2004-Ohio-1460, ¶ 34-35. The Tenth District held that even if he was not a shareholder or officer of the corporation during the relevant period, he could be reached by piercing. *Id.* at ¶ 32-37. The court explained:

> It has been held that, "in applying the 'instrumentality' or 'alter ego' doctrine, the courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit, Co.* (C.A.4, 1976), 540 F.2d 681, 685. Thus, in certain instances, courts have looked beyond the issues of ownership interest or title to determine whom the controlling party really is. *Id. See, also, Miramax Film Corp. v. Abraham* (Nov. 25, 2003), S.D.N.Y. No. 01 CV 5202 ("Even the absence of proof that Abraham has any ownership interest in Phoenix, or is an officer or director of the corporation, does not foreclose the possibility that Abraham was the controlling party over Phoenix with regard to the transaction at issue"); *Henderson v. Rounds & Porter Lumber Co.* (W.D.Ark.1951), 99 F.Supp. 376, 383–384 ("the real basis of liability is actual control and manipulation of the [subservient corporation], whether that control and manipulation be exercised by virtue of stock ownership or otherwise").
>
> In the present case, despite the fact Alio Gasbarro may not have been a shareholder or officer of Midwest Farms at the time of the transactions between that corporation and appellee, the evidence indicates that he was in a position to, and did in fact, act as a controlling force behind the actions of Midwest Farms. To ignore the facts

regarding the control exercised by Alio Gasbarro over the corporation based solely upon shareholder or officer status would be to elevate form over reality, to the detriment of creditors. *DeWitt Truck, supra.* Nor are we persuaded that controlling law requires us to disregard such evidence in considering the issue of personal liability under an alter ego theory.

*Id.* at ¶ 36-37.[3]

**{¶76}** Premier Therapy urges this court to adopt the above holding and conclude the person or entity to be held liable under the doctrine of piercing the veil of a limited liability company need not be a registered member of the limited liability company. We agree, but there are some additional considerations that must be addressed here with regards to Brewster Parke, Inc.

**{¶77}** Neither party reviews the Supreme Court's decision in *Minno* where the syllabus reads: "A corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation." *Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 2009-Ohio-1247, 905 N.E.2d 613, syllabus. "Because this situation does not involve the owner of a corporation misusing his control over that corporation, we conclude that the doctrine does not apply." *Id.* at ¶ 1.

**{¶78}** In *Minno*, an employee, who alleged serious injury was incurred as a result of unsafe work conditions, sued his employer (who carried no general liability insurance) plus a related corporation (which carried this insurance). No individual claims were made against the shareholders. The appellate court reversed summary judgment, finding there were genuine issues as to whether the corporations were "fundamentally indistinguishable." *Id.* at ¶ 5. The Supreme Court reversed, finding the piercing doctrine inapplicable as a matter of law.

---

[3] *Sanderson*'s other holding was abrogated in *Dombroski*. *Sanderson* was part of the line of cases that added "unjust or inequitable acts" to the second prong of *Belvedere* (commission of a fraud or illegal act). *Dombroski* changed the second prong to add "or similar unlawful act" but rejected the broader addition of "unjust or inequitable acts." *Dombroski*, 119 Ohio St.3d 506 at ¶ 27-29.

**{¶79}** The Court reviewed how *Belvedere* involved whether an individual shareholder was liable for the misdeeds of the corporation and *Dombroski* involved whether a parent corporation was liable for the misdeeds of the subsidiary. *Id.* at ¶ 11. "The common element in both of these situations is that the party upon whom liability is sought to be imposed had a controlling interest through ownership of more than one-half of the voting stock in the corporation allegedly committing wrongful acts." *Id.* The Court then distinguished the situation where a plaintiff "seeks to impose liability upon a corporation that holds no ownership interest in the corporation that allegedly committed the wrongful acts." *Id.* at ¶ 12. The Court explained: "Any wrongful act committed by one sister corporation might have been instigated by the corporation's owners, but it could not have been instigated by the corporation's sister." *Id.*

> Thus, we hold that a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation. A corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation. Despite the element of common shareholder identity, sister corporations are separate corporations and are unable to exercise control over each other in the manner that a controlling shareholder can. This lack of ability of one corporation to control the conduct of its sister corporation precludes application of the piercing-the-corporate-veil doctrine.

*Id.* at ¶ 13.

**{¶80}** As the Supreme Court has rejected this form of piercing, the liability of Brewster Parke, Inc. for the misdeeds of Holander House, Ltd. may not arise through veil piercing. Even without veil piercing to hold Brewster Parke liable for Holander House's judgment, liability for the monetary judgment is not altered as Brewster Parke took title to the real estate without providing compensation and participated in

the transaction as discussed in the third assignment of error, where the claim for fraudulent conveyance is addressed. Piercing was an alternative path to liability.

**{¶81}** Finally, the *Minno* holding does not assist David Childs and his acts performed individually and via his sole proprietorship. We note that a sole proprietorship has no legal identity separate from that of the individual who owns it. *See, e.g., Patterson v. V & M Auto Body*, 63 Ohio St.3d 573, 574-575, 589 N.E.2d 1306 (1992). David Childs and/or his sole proprietorship (Management Services Company) were said to be managing Holander House (or he was said to be an owner even though he was not a registered owner) at the time of the transfer.

**{¶82}** Although the *Minno* Court spoke much of piercing to reach shareholders, the issue of officer or director liability was not before the Court. The Court recited, the doctrine of piercing the corporate veil is a "judicial act of imposing personal liability on otherwise immune corporate officers, directors, or shareholders for the corporation's wrongful acts." *Minno*, 121 Ohio St.3d 464 at ¶ 8. A manager of an LLC is akin to those who direct a corporation. *See* R.C. 1705.48(B) (providing limited liability to a member {akin to shareholder} *or* manager of the LLC). This court concludes an LLC manager can be subject to liability through piercing if the three *Belvedere* elements are met. Whether David Childs was managing Holander House in such a manner that he was its alter-ego is the next question.

Piercing Argument C: Alter-ego

**{¶83}** The final argument under this assignment of error asks whether there was sufficient evidence of control over Holander House to submit the issue of veil piercing to the jury. This involves the first prong of the piercing test: whether domination and control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own. *See Belvedere*, 67 Ohio St.3d at 288-289. This is known as the "alter ego" doctrine, and it requires the plaintiff to show "the individual and the corporation are fundamentally indistinguishable." *See id.* at 288.

**{¶84}** In the corporate context, a non-exhaustive list of factors which can be considered include: (1) inadequate capitalization; (2) insolvency at the time of the

disputed act; (3) the individual held himself out as personally liable for certain corporate obligations; (4) siphoning of funds or assets of the entity for personal expenditures or use; (5) the entity's inability to pay debts due to high salaries or loans to shareholders; (5) commingling of individual and entity funds; (6) disregard of corporate roles; (7) disregard of corporate formalities; (8) lack of corporate records, especially regarding claimed loans to or from the entity to be pierced; (9) common office space; (10) personnel; and (11) the degree of domination by the person to be held liable, e.g. where the corporation was a mere facade for the operations of the dominant shareholders. *See, e.g., LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 422-23, 602 N.E.2d 685 (6th Dist.1991); *S & R Recycling*, 195 Ohio App.3d 744 at ¶ 31.

**{¶85}** These factors are guidelines for assisting a court in determining whether the initial prong is satisfied. They are not mandatory considerations. *State ex rel. Petro v. Mercomp, Inc.*, 167 Ohio App.3d 64, 2006-Ohio-2729, 853 N.E.2d 1193, ¶ 26 (8th Dist.), citing *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir.2001) (consider the degree of control with regard to the contested act and the equities). If the individual to be charged exercised such complete control over the company that the company appeared to have no separate existence, then the company can be considered the individual's alter-ego. *Belvedere*, 67 Ohio St.3d at 288.

**{¶86}** In supporting the trial court's refusal to direct a verdict, Premier Therapy points to two letters. A December 10, 2008 letter was sent by Mr. Childs to his attorney wherein Mr. Childs noted that Holander House had been bouncing checks and the bank was about to start a process to recall the loan with a balance of $1.75 million. Mr. Childs said Mr. Hergenrother drained the company of cash by writing himself checks exceeding $10,000 per month. Mr. Childs stated, "I am willing to come forth and do what I must, but am not willing to do so if I do not have control of the assets." (Emphasis original). He posited the assets may be worth more than $2.4 million. (Pl. Ex. 6).

{¶87} An April 8, 2009 letter was sent from Appellants' attorney to the bank's counsel. The letter referenced a pending offer by Jilltin and said this potential buyer would be commencing day-to-day management immediately. The letter said: "David Childs will request permission to transfer title to himself, an entity created by him, or to Brewster Parke * * * The purpose of that obviously is to avoid having trade and payroll tax creditors obtaining liens which attach to the premises, all of which would make the ultimate closing with Jilltin more difficult." The letter provided that if the deal with Jilltin fell through, then "David's last option is to simply move in and run the business himself until it can be sold." (Pl. Ex 42). The deal with Jilltin did fall through.

{¶88} Appellants say this does not show control of the limited liability company was then exercised to commit the fraud. (They dispute whether the transfer was fraudulent in the next assignment of error). They construe the letters as meaning he would want control under certain circumstances and claim this is not evidence that complete control then occurred in order to support a piercing claim.

{¶89} Premier Therapy points to the testimony of Mr. Brindiar. He was employed at Holander House since its inception. He acted as interim licensed nursing home administrator from March 2009 until the final sale in September 2009. He said a company who was interested in buying Holander House began managing the facility in March. He also said the Hergenrothers stopped coming to the facility. (Tr. 909). According to Mr. Brindiar, Management Services Company (the sole proprietorship of Mr. David Childs) took over Holander House's management from May or June of 2009 until the new ownership in September 2009. (Tr. 895-896, 904). He named his initial contact at Management Services; he said John Childs (a relative of Mr. Childs) and another employee of Mr. Childs were involved as well. (Tr. 896). He explained that Holander House's invoices were provided to Management Services for payment, but he did not know who directed which invoice should be paid. (Tr. 904).

{¶90} Appellants say this witness's testimony requires one to speculate about whether more control was exercised by Management Services than mere payroll and

bookkeeping services. Premier Therapy asks us to view this testimony in conjunction with the letters and points to the following testimony provided by Mr. Childs. For instance, Management Services Company (the sole proprietorship of Mr. Childs) performed payroll services for Holander House; its other clients were Mr. Childs' two other nursing homes, Brewster Parke, Inc. and Bel Air (his sole proprietorship). (Tr. 551-552). The accounting for Holander House was performed by Appellants' accountant. (Tr. 614-615). All companies had the same lawyer, who represented Mr. Childs for years and was asked to facilitate the sale of Holander House. Management Services charged Holander House $1,500 per month for its services. They often waived payment for services and eventually stopped billing Holander House for services. (Tr. 705).

**{¶91}** Mr. Childs authorized various loans to Holander House from the funds of Brewster Parke, Inc. and Bel-Air. Each company had an outstanding note for $50,000. (Tr. 601). Various other "short-term loans" were undocumented. Most remained unpaid for a total of $125,000. (Tr. 598-608, 706-707). Mr. Childs provided money to Holander House for the purpose of making mortgage payments. (Tr. 640-641, 787).

**{¶92}** Records of Brewster Parke showed a Holander House note receivable of $104,644 on June 30, 2009. By the end of 2009, the balance was listed as $26,000. Mr. Childs said Brewster Parke did not receive payment from Holander House to decrease this balance, claiming they were writing it off. (Tr. 603-604). Mr. Childs was asked to review various payments from Holander House to Brewster Parke in 2009, which he said must have been to repay some of the undocumented loans previously made to Holander House. (Tr. 607-608). He noted these loans were undocumented because they were to his daughter and recognized this was not a usual practice in business. (Tr. 608). He also disclosed that his daughter turned over her 17.5% share ownership in Brewster Parke to satisfy some of the

indebtedness. (Tr. 605).[4]

**{¶93}** As to his letter, Mr. Childs explained he would not put a second mortgage on Brewster Parke for over $2 million (due to the bank's inclination to foreclose on Holander House) without getting control of the realty. (Tr. 652). He says he did not realize Holander House was still obligated on its own mortgage after the transaction. (Tr. 657-658). He said his attorney made efforts to sell Holander House due to his personal guarantee, noting the same attorney represented Holander House and the Hergenrothers. (Tr. 661). He acknowledged his daughter "divorced herself from the business aspect" and his son-in-law then became less involved as well. (Tr. 666).

**{¶94}** Appellants point out that Mrs. Hergenrother signed the June 2009 purchase agreement on behalf of Holander House. (Tr. 668). However, Mr. Childs' signature was the only one on the sellers' closing statement of September 2009. (Tr. 675). He said the real estate value allocated in the sale was tailored to approximate the amount he owed to the bank. (Tr. 677). Years after the sale, Mr. Childs wrote to the bank complaining the bank's pressure caused a loss of a million dollars on the Holander House sale, saying it was a "no brainer" to figure out whose million was lost.

**{¶95}** Premier Therapy concludes Mr. Childs, through his sole proprietorship and his corporation, exercised total domination and control over Holander House by seizing its assets and transferring them below market value to avoid paying creditors and to keep Mr. Childs from incurring liability on his personal guarantees. It is suggested he sold the company without regard to the low offer as he had no regard for Holander House and sole regard for his personal obligations.

**{¶96}** Again, we are reviewing the trial court's denial of directed verdict on the issue of whether Appellants acted as the alter ego of Holander House. (The value

---

[4] In a different context, the Sixth District has noted that a creditor can be seen as the debtor's alter-ego for certain purposes where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity. *Falcon Painting, Inc. v. Trustcorp Bank, Ohio*, 6th Dist. Lucas No. L-90-285, (Nov. 8, 1991) (citing cases concerning an exception to doctrine that creditor is not fiduciary of debtor).

issues are presented in the next assignment of error.) We must construe the evidence presented on the issue of domination and control most strongly in favor of Premier Therapy as the non-movant. *See* Civ.R. 50(A)(4).

**{¶97}** Directed verdict was available only if reasonable minds can solely conclude Appellants did not exercise such control over the company that it lacked a separate will. *Belvedere*, 67 Ohio St.3d at 288 (if the party to be held liable exercised such complete control over the company that the company appeared to have no separate existence, then the company can be considered that party's alter-ego). The case must proceed to the jury if "there exists any evidence of substantive probative value that favors the position of the nonmoving party." *Goodyear*, 95 Ohio St.3d 512 at ¶ 3. Even if it is necessary to review and consider the evidence, a motion for directed verdict presents a question of law, not a factual question. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25.

**{¶98}** In considering the totality of the circumstances, this court concludes there was sufficient evidence of such alter-ego control to permit the issue to proceed to the jury. A juror could rationally conclude Mr. Childs was making all the decisions at Holander House at the time of the transfers and Holander House was his mere conduit or instrumentality to reach the end result most favorable to his personal situation. Mr. Childs transferred money to Holander House from his corporation and his sole proprietorship without documentation (with the exception of two notes). Money was paid back to his entities during the time Holander House was in distress. This commingling occurred during the sale of all of Holander House assets. He was personally liable on Holander House's bank loan; he then obligated his corporation with a second mortgage as additional collateral to appease the bank.

**{¶99}** The controlling (51%) member of the limited liability company abandoned her management duties; when the other (49%) member took over management, he wrote himself large monthly checks causing checks for obligations to bounce. Mr. Childs was aware of these irregularities when he wrote the December 2008 letter indicating his intent to take control of the assets if he helped avoid foreclosure. An April letter to the bank from Mr. Childs' attorney spoke of the desire

to transfer title of the realty to Mr. Childs or one of his entities in order to avoid creditors. The long-time attorney of Mr. Childs represented Holander House as well.

**{¶100}** The real estate of Holander House was transferred to Mr. Childs' corporation (even though Holander House remained primarily liable on the loan and the transfer was subject to the bank's first mortgage). Mr. Child's sole proprietorship, Management Services Company charged Holander House $1,500 to $1,600 per month for accounting and check processing services. He started waiving the fee in 2009, long after it had become impossible for Holander House to pay. Individuals who worked for his companies took over financial decisions more than they previously had.

**{¶101}** Although there is no indication the business assets (bed licenses) transferred prior to the final sale with an unrelated entity (and a member of Holander House signed the June 2009 asset purchase agreement), there is evidence Mr. Childs (and Mr. Childs through his attorney) directed the sale and chose the amounts to allocate to realty versus bed licenses in the purchase documents. He personally indemnified the buyer on the separate asset purchase agreement (not merely on the real estate agreement). He took his daughter's stock in his own corporation. He was the only seller to sign the closing statement on behalf of Brewster Parke and Holander House.

**{¶102}** We note Appellants point to the testimony of two of its witnesses. Holander House's office manager testified the Hergenrothers operated Holander while she was employed from 2002 until June 2009. (Tr. 1175, 1185-1186). She said Appellants did not make decisions as to which vendors would be paid or instruct her to write any checks. (Tr. 1212-1213). A selling agent testified he was retained in December 2008 by Mrs. Hergenrother, on behalf of Holander House, to advise whether they should sell Holander House and to find a buyer. (Tr. 1228-1233). It was his impression the Hergenrothers operated Holander House, not Appellants.

**{¶103}** Premier Therapy responds this shows the selling agent hired to find a buyer for Holander House was "kept in the dark" and was not included in the transfer of realty to Brewster Parke, Inc. or in the sale to HCS Capital in 2009. (Tr. 1239).

Instead, Mr. Childs and his attorney transferred the realty and looked for their own buyer. (Tr. 661). As to the office manager, Premier Therapy claims her testimony can be discounted as she was employed by Mr. Childs. (Tr. 1212). Although she wrote checks and said they could not always pay the mortgage on time, she was unaware Mr. Childs helped with the mortgage payments. (Tr. 1197).

{¶104} In any event, Appellants' opposition evidence would not touch upon the sufficiency of the evidence presented by Premier Therapy for purposes of the directed verdict motion. Where there are rational competing inferences or available constructions of the evidence, the question is one of weight, not sufficiency. *See Eastley*, 132 Ohio St.3d 328 at ¶ 21. A verdict can only be set aside on grounds of weight of the evidence in a case where the trier of fact clearly lost its way and created a manifest miscarriage of justice; every reasonable presumption is to be made in favor of the fact-finder who occupies the best position to evaluate the demeanor, gestures and voice inflections of the witness in order to adjudge credibility. *Eastley*, 132 Ohio St.3d 328 at ¶ 12-21; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.[5] An evaluation of all evidence would involve a review of the manifest weight of the evidence to support the jury's verdict, which Appellants did not raise here.

{¶105} "[S]ufficiency of the evidence is quantitatively and qualitatively different from the weight of the evidence." *Eastley*, 132 Ohio St.3d 328 at ¶ 23. "[A] directed verdict motion made at the close of plaintiff's evidence is evaluated on the evidence in the plaintiff's case in chief * * *." *Chemical Bank of New York v. Neman*, 52 Ohio St.3d 204, 207, 556 N.E.2d 490 (1990) (and the renewal of the motion at the close of all evidence is the preservation of the claim).

{¶106} Even if evidence is not overwhelming, a plaintiff can set forth sufficient evidence to avoid directed verdict if there is any evidence of substantive probative value that favors the position of the nonmoving party. *Goodyear*, 95 Ohio St.3d 512

---

[5] Not only would we afford great deference to the jury on the piercing decision, but a reversal on weight of the evidence would require a concurrence of all three judges. *See* Ohio Constitution, Article IV, Section 3(B)(3).

at ¶ 3. Circumstantial evidence is afforded the *same probative value* as direct evidence. *See, e.g., State v. Jenks*, 61 Ohio St.3d 259, 263-264, 272–273, 574 N.E.2d 492 (1991). Considering all of the pertinent testimony and the available rational inferences in the light most favorable to Premier Therapy, this court concludes there is sufficient evidence permitting Premier Therapy to present its case of veil piercing to the jury. As reasonable minds could find against Mr. Childs on the alter-ego and control element of piercing, this argument is overruled.

ASSIGNMENT OF ERROR NUMBER THREE

{¶107} Appellant's third assignment of error provides:

"THE TRIAL COURT ERRED IN FAILING TO AWARD SUMMARY JUDGMENT AND/OR DIRECTED VERDICT TO THE APPELLANTS ON THE PLAINTIFF'S CLAIM FOR FRAUDULENT CONVEYANCE AND THE UNDERLYING CIVIL CONSPIRACY CLAIM AS THE APPELLANTS COULD NOT HAVE COMMITTED A FRAUDULENT CONVEYANCE AS THE TRANSFER AT ISSUE DID NOT INVOLVE AN ASSET."

{¶108} The arguments presented under this assignment of error deal with the fraudulent conveyance and the dependent civil conspiracy claim. Appellants separate this assignment of error into six parts labeled A through E. The specific statement in the text of the assignment of error is argued in part A. Part A and the two parts thereafter are related to the application of "the Ohio uniform fraudulent transfer act." *See* R.C. 1336.11 (titling the act).

{¶109} Pursuant to R.C. 1336.04(A), a transfer made by a debtor is fraudulent as to a creditor (whose claim arose before or after the transfer[6]) if the debtor made the transfer in *either* of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

---

[6] Effective March 27, 2013, this clause reads, "whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer * * *."

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

{¶110} Pursuant to R.C. 1336.08(A), "A transfer or an obligation is not fraudulent under division (A)(1) of section 1336.04 of the Revised Code against a person who took in good faith and for a reasonably equivalent value or against any

subsequent transferee or obligee."  A non-exhaustive statutory list of the "badges of fraud" can be considered to determine actual fraudulent intent:

(B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

**{¶111}** In addition to the option involving actual fraudulent intent, there is constructive fraud in division (A)(2) as quoted above. Constructive fraud is also addressed in R.C. 1336.05. For instance, R.C. 1336.05(A) provides a transfer is fraudulent as to a creditor, whose claim arose before the transfer, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent or became insolvent as a result of the transfer[7].

<u>Part A: Transfer of an Asset</u>

**{¶112}** First, Appellants contend they could not have committed a fraudulent transfer as they were not involved in the transfer of an asset as defined in R.C. 1336.01. "Transfer" is defined as "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting *with an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." R.C. 1336.01(L) (emphasis on portion relevant to Appellants argument). "Asset" is defined as: "property of a debtor, but does not include * * * [p]roperty to the extent it is encumbered by a valid lien * * *." R.C. 1336.01(B)(1).

**{¶113}** Initially, we address the argument (moved from part C) that the transfer of Holander House's business assets cannot be attributed to Appellants as: they were not a party to that portion of the agreement; they were not the owners of the business assets; and they were not debtors of Premier Therapy as the debt was owed by Holander House. They rely on a case where a plaintiff claimed a corporation's transfer of property was fraudulent because her former husband owed

---

[7] *See also* R.C. 1336.05(B) (transfer to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent). A claim under that division, however, carries a one-year statute of limitations. R.C. 1336.09(C). *Compare* R.C. 1336.09(A) (statute of limitations for a claim under division (A)(1) of R.C. 1336.04 is four years after the transfer, or if later, one year from which claimant reasonably could have discovered the transfer); (B) (statute of limitations for a claim under R.C. 1336.04(A)(2) or 1336.05 (A) is four years).

her child support. The First District found the corporation was not a debtor to the former wife, the husband never owned the property, and the corporation was not liable for the husband's debts. *Gershuny v. Gershuny*, 1st Dist. No. C-140482, 2015-Ohio-4454, ¶ 11-16 (reverse application of veil piercing is not available in Ohio).

{¶114} This case is distinguishable. Holander House was the debtor; the debtor owned the assets at issue. Premier Therapy refers back to the second assignment of error to answer why Appellants would be liable for transferring the business assets: as the alter-ego of Holander House. In addition, there is the question of collapsing the transactions into a single transaction and Appellants' participation in the transactions viewed as a whole. Although Brewster Parke may have been able to avoid liability as the alter-ego of Holander House (as discussed in the prior assignment of error), its liability for fraudulent transfer is equivalent and is upheld due to its participation as discussed infra.

{¶115} Appellants focus on the transfer of the real estate to Brewster Parke. Brewster Parke took title to the realty and sold it to HCS Capital for $1.7 million. Premier Therapy presented no evidence that this was less than fair market value for the realty. The expert utilized by Premier Therapy used the $1.7 million sale price as the value of the realty in testifying as to her opinion on the value of the bed licenses and the ultimate total value of Holander House. (Tr. 1059-1060). The bank's lien was more than $1.7 million at the time of both transfers. (Tr. 872-873). The September 18, 2009 closing statement listed the bank payoff as $1,717,899.71. (Pl.Ex. 36).

{¶116} From this, Appellants conclude the realty did not qualify as an "asset" because it was fully encumbered by a bank lien. Appellants say the evidence was not sufficient to find the realty an asset and/or the jury verdict was contrary to the manifest weight of the evidence. They cite a Tenth District case where all the debtor's assets were secured so that the fair market value of the assets was less than the amount of debt owed to the bank. *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App.3d 644, 651, 622 N.E.2d 1113 (10th Dist.1993). As the assets were fully encumbered at the time of transfer, the assets were found exempt

from the uniform fraudulent transfer act. *Id.* at 651-652 (as the equipment was not an "asset," it would not qualify as a "transfer").

**{¶117}** Nevertheless, *Baker* did not involve the scenario where: a business transfers all of its assets separately; one asset was transferred without payment (to a company owned by an individual who had personally guaranteed a note of the transferor-debtor); the transferor-debtor remained liable to the bank after the transfer; the asset was fully encumbered by a valid lien; the other business assets were not encumbered by a valid lien; and those unencumbered assets were allegedly sold below market value *in a sale that required the participation of the transferee of the asset encumbered by the lien*. Appellants note that Premier Therapy relied on a "collapsing" doctrine in order to view as a whole: the transfer of the real estate from Holander House to Brewster Parke and then to HCS Capital, and the transfer of the business assets (bed licenses) from Holander House to HCS Capital. They do not argue the doctrine is invalid. Appellants contend that even if we view the transactions as a whole, they were only involved in the sale of the real estate.

**{¶118}** Premier Therapy contends the transfer to Brewster Parke was one part of the overall scheme to sell and to distribute Holander House property (real and personal) before Premier could obtain judgment. There is no dispute Appellants had knowledge of the entire deal; Mr. Childs personally guaranteed certain obligations for not only the realty (owned by Brewster Parke at the time) but also for the business personal property which was part of the sale. Besides emphasizing that the transfer to Brewster Parke was for the express purpose of avoiding creditors, Premier Therapy urges the transactions should not be considered in isolation, claiming it was the combined sale of Holander House's total assets that was fraudulent.

**{¶119}** Multiple transactions designed to perpetuate a fraud can be considered a single transaction. *See Masonic Health Care, Inc. v. Finley*, 176 Ohio App.3d 529, 2008-Ohio-2891, 892 N.E.2d 942, ¶ 49 (2d Dist.). "Thus an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." (Internal quotations omitted). *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35

(2d Cir.1993) ("we will not turn a blind eye to the reality that the transfer of the New York Property and the spin-off of KIC shares constituted a single, integrated transaction. This transaction, viewed in its entirety, was not supported by fair consideration.")

{¶120} The transfer of the real property to Brewster Parke was done without an accompanying agreement and without payment; Holander House remained liable on the note secured by the mortgage. The agreement with HCS Capital was dependent on the sale of the realty and the bed licenses. The final sale price was said to be more than $650,000 below fair market value due to the alleged undervaluing of the bed licenses (that conclusion is reviewed in part D below). As the real property was only part of the transaction, the mere fact that it was fully encumbered by a bank lien would not remove it from the fraudulent transfer analysis. In fact, Mr. Childs stated that the amount allocated to the realty was chosen to reflect the amount owed to the bank. (Tr. 677). Mr. Childs had an interest in the final figures (due to personal guarantees and a second mortgage).

{¶121} Appellants say the realty was not an asset and the jury lost its way in finding that it was. Yet, the jury was instructed that multiple transactions can be considered. Based upon those instructions, the jury essentially found a continuous transaction. When the transactions are collapsed and viewed as a whole, the bank lien on the realty did not eliminate Mr. Childs or Brewster Parke from being participants in the final sale, which was dependent on a transfer of the realty and the bed licenses. Moreover, the acts of a co-conspirator in engaging in fraudulent conduct can be attributed to each participant in the conspiracy. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 476, 700 N.E.2d 859 (1998). On the fraudulent transfer and conspiracy claims, the jury allocated 75% of the liability to Mr. Childs and Management Service Company and 25% of the liability to Brewster Parke, Inc. Collapsing the occurrences into a single transaction, a reasonable juror could consider Brewster Parke a participant along with Mr. Childs. These arguments are overruled.

Part B: Reasonably Equivalent Value

{¶122} As to the real estate, Appellants alternatively contend they had a defense because Brewster Parke provided Holander House reasonably equivalent value in exchange for the realty. They claim Brewster Parke assumed the Holander House mortgage. However, no agreements relating to mortgage assumption were entered. Holander House remained primarily liable on the note secured by the mortgage even after the realty was transferred to Brewster Parke. Mr. Childs testified he assumed Holander House was no longer liable when he signed a mortgage on Brewster Parke property. (Tr. 657-658). However, the mortgage payments continued to be made from Holander House's account, and Holander House was still liable for the note secured by the mortgage after transferring its property to Brewster Parke. (Tr. 805, 828, 888).

{¶123} Appellants reply that even if Holander House was not released from its obligation, the additional collateral provided to the bank by Brewster Parke (who allowed the bank to take a second mortgage on its property) should be considered reasonably equivalent value. They cite the *Crocker* case. However, that case is distinguishable. In that case, the wife took out a mortgage *on the property given to her*; she used the proceeds to pay legal fees for her husband, who gave her the property (as part of a divorce settlement). *Crocker v. Hood*, 113 Ohio App.3d 478, 482-483, 681 N.E.2d 460 (9th Dist.1996).

{¶124} In this case, Brewster Parke allowed a lien to be taken on its own property in order to provide the bank additional collateral while a sale of Holander House was negotiated. Even if there was some value to Holander House by preventing the bank from demanding payment in full, this did not qualify as a "reasonably equivalent value" to Holander House for the initial transfer of the realty. Although not cited by Appellants, the defense provided to a transferee in R.C. 1336.08(A) requires reasonably equivalent value *and good faith*.

{¶125} The jury found actual intent to defraud, hinder, or delay Premier Therapy's collection efforts; reasonably equivalent value is a factor considered in determining actual intent. To the extent the Holander House veil was properly

pierced, the finding of actual intent to defraud would be attributed to the alter-egos. Regardless, there was a finding of conspiracy as well, and all participants in a conspiracy are liable for the steps taken by their co-conspirators. *Williams,* 83 Ohio St.3d at 476. Finally, with the transactions collapsed, a reasonably equivalent value can be evaluated by viewing the value of the whole and is best answered after reaching the damages argument. *See* part D infra.

<u>Part C: Necessary parties</u>

**{¶126}** Appellants contend: "Although Appellants herein do not acknowledge that any transfer of the business assets is pertinent to these Appellants, as these Appellants never owned the business assets, this claim would also fail for failure to name HCS Capital as a Defendant." Appellants allege the buyer of the Holander House realty and business assets was a necessary party under R.C. 1336.07. This statute provides:

(A) In an action for relief arising out of a transfer or an obligation that is fraudulent under section 1336.04 or 1336.05 of the Revised Code, a creditor or a child support enforcement agency on behalf of a support creditor, subject to the limitations in section 1336.08 of the Revised Code, may obtain one of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the claim of the creditor;

(2) An attachment or garnishment against the asset transferred or other property of the transferee in accordance with Chapters 2715. and 2716. of the Revised Code;

(3) Subject to the applicable principles of equity and in accordance with the Rules of Civil Procedure, any of the following:

(a) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee;

(c) Any other relief that the circumstances may require.

(B) If a creditor or child support enforcement agency has obtained a judgment on a claim against the debtor, the creditor or agency, if the court so orders, may levy execution on the asset transferred or its proceeds in accordance with Chapter 2329. of the Revised Code.

Besides this statute, Appellants cite two cases in support of their assertion that the final buyer was a necessary party.

{¶127} In *Commonwealth*, the Ninth District said, "transferees are necessary parties to a claim for fraudulent conveyance not because their participation in the fraud must be proven, but because they hold an interest in the property that is the subject of the conveyance." *Commonwealth Land Title Ins. Co. v. Choice Title Agency, Inc.*, 9th Dist. No. 11CA009981, 2012-Ohio-2824, ¶ 11. Notably, this statement was made in the context of discussing the defenses and rights of a transferee, *who was a party* in that case. *Id.* The court also stated that trial court can fashion a remedy appropriate to the case. *Id.* at ¶ 19.

{¶128} In the *Dolce* case, the trial court attempted to garnish bank accounts *held by a non-party to the action*. The Eleventh District adopted the position: "in an action to set aside a fraudulent transfer and subject assets in the hands of a third person or transferee to payment of the debt, the debtor and the third person or transferee are proper and necessary parties to the action." *Dolce v. Lawrence*, 11th Dist. No. 96-L-129 (May 23, 1997). Importantly, the court also concluded the trial court lacked personal jurisdiction to order such garnishment in order to force a non-party to the suit to provide the proceeds of a transfer to the claimant. *Id.*

{¶129} Although Appellants do not refer to the rule on joinder, a review of Civ.R. 19(A) is warranted:

A person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (a) as a practical matter impair or impede his ability to protect that interest or (b) leave any of the persons already parties

subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest, or (3) he has an interest relating to the subject of the action as an assignor, assignee, subrogor, or subrogee. * * *

{¶130} Premier Therapy responds that they were not required to join a subsequent transferee if they were not attempting to collect from that transferee. Premier Therapy emphasizes the remedy sought was money damages, rather than a constructive trust over the property transferred. They note once a judgment has been obtained, the court is not limited to levying execution on the asset, citing R.C. 1336.07(B).[8] Premier Therapy also cites R.C. 1336.07(A)(3)(c), which provides a catch-all remedy of "[a]ny other relief that the circumstances may require."

{¶131} Additionally, R.C. 1336.10 provides: "Unless displaced by this chapter, the principles of law and equity, including, but not limited to, the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of this chapter." In ruling that punitive damages and attorney fees can be awarded in a fraudulent conveyance suit, the Supreme Court relied on a similar provision (in former R.C. 1336.11) to hold that common-law remedies, including those available under the law of fraud, may be applied when appropriate in fraudulent conveyance cases. *Locafrance U.S. Corp. v. Interstate Distrib. Servs., Inc.*, 6 Ohio St.3d 198, 202, 451 N.E.2d 1222 (1983). Finally, R.C. 1336.08 provides in part:

> (B)(1) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor or a child support enforcement agency under division (A)(1) of section 1336.07 of the Revised Code, the creditor or agency may recover a judgment for the value of the asset transferred, as adjusted under division (B)(2) of this

---

[8] Premier Therapy also notes the statute of limitations has run for any claim against HCS Capital, meaning there is no chance of conflicting judgments, which was a concern expressed in *Dolce* due to the collections efforts against a non-party.

section, or the amount necessary to satisfy the claim of the creditor or agency, whichever is less. The judgment may be entered against either of the following:

(a) *The first transferee of the asset or the person for whose benefit the transfer was made*;

(b) Any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

(2) If the judgment under division (B)(1) of this section is based upon the value of the asset transferred, the judgment shall be in an amount equal to the value of the asset at the time of transfer, subject to adjustment as the equities may require.

(Emphasis added.) R.C. 1336.08(B). Thus, even if the transfer is voidable, it need not be eliminated, and the court can enter judgment against the first transferee or the person for whose benefit the transfer was made.

{¶132} We conclude the plaintiff in an action under the fraudulent transfer act need not join every subsequent transferee. The necessary party would be the transferee (or participant for whose benefit the transaction was made) from whom recovery is sought. The plaintiff here was not attempting to collect against the subsequent transferee. The statute relied upon by Appellants, R.C. 1336.07, does not support their argument. This argument lacks merit.

Part D: Damages for Fraudulent Transfer

{¶133} Under this section, Appellants argue: "Assuming arguendo that piercing the corporate veil is an available remedy and that a fraudulent transfer occurred, the damages awarded were against the manifest weight of the evidence and Ohio law." The jury found the fraudulent transfer caused $592,928.72 in damages to Premier Therapy (allocating 75% of the liability to Mr. Childs and Management Service Company and 25% of the liability to Brewster Parke, Inc.). Appellants argue this damage award was against the manifest weight of the evidence

because it was based upon speculation as to the fair market value of the bed licenses in excess of the $500,000 they received.

{¶134} Appellants urge Holander House accepted the best offer and the total sale price of $2.2 million was a fair value. They point out that Ms. Hergenrother hired Mr. Weimer to help evaluate and sell the business. He testified the business was losing residents and money. He noted one potential buyer voiced he could just wait until a foreclosure sale and purchase the property at a discount. (Tr. 1231). Mr. Weimer did not think the business could have found a higher buyer if it waited longer; he also did not believe the business would sell for more than the bank debt, but it did. (Tr. 1230). He was not involved with procuring the interest of Jilltin; nor was he involved in the HCS Capital sale. (Tr. 1239-1240, 1251).

{¶135} Appellants conclude the best measure of fair market value was the sale price in an arm's-length transaction, such as the one to HCS Capital for $2.2 million. Appellants believe Premier Therapy's value arguments are based upon a piecemeal sale of the realty and bed licenses, urging there is no evidence a buyer would have paid $1.7 million for the realty if the bed licenses were not part of the transaction. However, the expert presented by Premier Therapy did not base her opinion on a piecemeal sale. Although the sale was arm's-length, Premier Therapy insists Mr. Childs entered the sale below fair market value without regard to the effect on Holander House as he was solely concerned with his own financial position as the guarantor. It is claimed he wished to quickly extract himself from the situation to the detriment of other creditors, including Holander House's biggest creditor – Premier Therapy, who had a pending lawsuit.

{¶136} The Hergenrothers, with Mr. Childs as a guarantor, purchased the business in 2002 for $2.663 million from an estate (of which Mr. Childs was the executor). In December 2008, Mr. Childs expressed an opinion that the assets may be worth "considerably more" than $2.4 million. In the spring of 2009, Jilltin originally expressed interest in entering a lease (of up to one year) and then buying the business for up to $2.5 million. The offer was thereafter reduced to less than the $2.2 million received in the sale to HCS Capital.

**{¶137}**   The agreement with HCS Capital was signed in June 2009 and closed in September 2009; the $2.2 million purchase price entailed $1.7 million for the realty and $500,000 for the business assets (bed licenses).  It was pointed out this sale of Holander House assets crafted by Mr. Childs provided $5,556 per bed license.  Within weeks of the closing, the buyer sold 15 bed licenses to Jilltin for $187,500, which is $12,500 per bed license.

**{¶138}**   Mr. Childs testified they were lucky to get the $2.2 million sale price.  In a 2012 letter to the bank, Mr. Childs complained Holander House could have been sold for an additional $1 million.  He blamed the lower price on the bank's pressure; although, he had responded to that pressure by providing additional security in the form of a mortgage on Brewster Parke.

**{¶139}**   Premier Therapy presented expert testimony as to the value of the bed licenses.  The expert opined the 90 bed licenses were worth at least $1.125 million, meaning the sale was $625,000 below market value.  She expressed, to a reasonable degree of professional certainty, this was a conservative estimate of what the market place was paying.  (Tr. 986, 999, 1023).  She used the figure of $12,500 per bed license, noting a $15,000 figure would have been justified as well.  (Tr. 993).  She reviewed sales around the state and in the local counties over various periods; she received this information from a government database.  (Tr. 991-993).  She pointed out that Holander House was not a willing seller at Jilltin's last offer of $2.1 million.

**{¶140}**   Mr. Weimer did not believe Holander House could have received $1.7 million for the realty if the purchase price for the bed licenses was listed as $1.125 million.  (Tr. 1252-1253).  He mentioned how the allocation of the purchase price in a sale agreement can be based upon various factors, such as taxes.  (Tr. 1255).[9] Premier Therapy's expert countered that it was not a proper accounting practice for a

---

[9] Although Appellants suggest this speculation (on manipulating the asset allocation) assists in their valuation argument, it also leads one to surmise the bank's secured portion of the transaction was actually much less than reported (to the benefit of Mr. Childs as the personal guarantor of the bank loan).  That is, if the real estate value was inflated (so the value of the business assets was hidden in the real estate transaction), this served to further protect Mr. Childs.

business owner to just arbitrarily decide purchase price allocations.  (Tr. 999, 1064).

{¶141}  It would be difficult to conclude the jury clearly lost its way on the issue of the fair market value of Holander House.  *See Eastley*, 132 Ohio St.3d 328 at ¶ 12-20, applying *Thompkins*, 78 Ohio St.3d at 387.  True, a rational juror could discount some testimony of Premier Therapy's expert.  She assumed the $1.7 million allocated to the realty was the fair market value.  She was not a real estate appraiser; she was hired to appraise only the bed licenses.  A reasonable juror could conclude the total price was fair, and it was merely allocated in a manner at odds with the actual value of each portion of the sale.  Notably, the last offer from another potential buyer was less than the amount received in the final sale.

{¶142}  Another juror could focus on the fact that Mr. Childs, as executor of his mother's estate, sold the business in 2002 to his daughter for $2.663 million and personally guaranteed the notes.  Still, although the final sale in 2009 was only $2.2 million, the center was losing residents and various market conditions may have changed.  The sale may have been rushed, but this could be attributed to the bank.  One could observe a foreclosure sale would have diminished the price and a receiver would have been appointed over the bed licenses.

{¶143}  Nonetheless, in conducting a weight of the evidence review, every reasonable presumption is to be made in favor of the fact-finder:  "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."  *Eastley*, 132 Ohio St.3d 328 at ¶ 21, quoting *Seasons Coal Co.,* 10 Ohio St.3d 77 at fn. 3.  All three appellate judges would have to agree to reverse on weight of the evidence.  Ohio Constitution, Article IV, Section 3(B)(3).  Weight is not a question of mathematics, but it is dependent on the effect in inducing belief.  *Eastley*, 132 Ohio St.3d 328 at ¶ 12.

{¶144}  Upon reviewing the entire record and considering the available reasonable inferences, we do not find the jury clearly lost its way and created a manifest miscarriage of justice.  *See Thompkins*, 78 Ohio St.3d at 387.  *See also Eastley*, 132 Ohio St.3d 328 at ¶ 12-20 (ordering the application of the *Thompkins*

weight of the evidence standard to civil cases). In accordance, the damages awarded for fraudulent transfer are not contrary to the manifest weight of the evidence.

Part E:  Civil Conspiracy

**{¶145}** Conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998). A claim of civil conspiracy cannot succeed unless there is an underlying unlawful act. *Id.* at 475. The acts of co-conspirators are attributable to each other. *Id.* at 476. Here, the civil conspiracy claim was based upon the underlying fraudulent transfer claim.

**{¶146}** Initially, Appellants point out if the fraudulent transfer claim fails (under their arguments set forth in the prior sections of this assignment of error), then the civil conspiracy claim would likewise fail. The jury was instructed accordingly: "You will only consider this claim if you found for Plaintiff on the claim of fraudulent transfer." (Tr. 1618). Premier Therapy urges they need only show one of the transfers was fraudulent and caused damages, citing the premise in *Williams* that co-conspirators' acts are attributable to each other. *Williams*, 83 Ohio St.3d at 476.

**{¶147}** The survival of the civil conspiracy claim is dependent upon this court's ruling on the fraudulent transfer claim. Due to our rulings on fraudulent transfer in the prior sections, the civil conspiracy claim survives.

**{¶148}** Appellants' next argument concerns whether the award of additional damages for conspiracy was supported by the evidence. The total compensatory damage award was $693,776.60. In interrogatories, the jury specified its award for the fraudulent transfer claim was $592,928.72, and the additional amount suffered as a result of the conspiracy was $100,847.88. Evidence was presented that $592,928.72 was the amount of the judgment obtained against Holander House by Premier Therapy. Appellants contest the additional amount of $100,847.88, urging there was no evidence offered during trial to support this figure.

**{¶149}** Premier Therapy responds that additional damages can be awarded on a conspiracy claim, citing law providing the damages incurred by the conspiracy can exceed the underlying tort. *See, e.g., Gosden v. Louis*, 116 Ohio App.3d 195, 221, 687 N.E.2d 481 (9th Dist.1996). Yet, this response does not reach the crux of Appellants' argument. Appellants are not concerned with the legal premise of whether additional damages can be awarded on a conspiracy claim. Rather, they are concerned with whether the award here was supported by any evidence. In other words, Appellants recognize a plaintiff need not present evidence of additional damages, over those established on the underlying tort, in order to succeed on the conspiracy claim. However, where additional damages are provided, there must be evidence in support.

**{¶150}** The jury apparently arrived at the figure based upon a statement of plaintiff's counsel during closing arguments about interest on the 2009 judgment. Counsel said: "And here's what Premier Therapy is asking for. They got a judgment $592,928.72 five years ago. Under - - with statutory interest - - that's covered by statute in Ohio - - in the assumed time, that's $100,797.88 * * *." (Tr. 1524). At this point and again in rebuttal, counsel asked for a total verdict in the amount of $693,776.60. (Tr. 1524, 1591). This amount minus the amount of the prior judgment equals $100,847.88 (the additional damages awarded by the jury).

**{¶151}** Appellants note there was no instruction on how to calculate interest. Appellants equate the closing argument with a request for pre-judgment interest on this judgment, urging that pre-judgment interest entails post-trial motions. *See* R.C. 1343.03.[10] Premier Therapy's closing arguments seemed to be envisioning post-judgment interest on the Holander House judgment.

---

[10] A statute governs pre-judgment interest. R.C. 1343.03. On torts, the recovery is via a post-trial motion and hearing before the trial court. R.C. 1343.03(C)(1). The trial court is to apply a statutory test regarding good faith efforts to settle. *Id.* The decision to award prejudgment interest is for the trial court to decide and not the jury. *See Elder v. Olivito*, 7th Dist. No. 97-JEX-00003 (Dec. 1, 1997) ("Further, we find no case law, nor has appellants cited to any, that would permit the jury to consider interest as part of the damages award"), citing *Moskovitz v. Mount Sinai Med. Ctr.*, 69 Ohio St.3d 638, 658, 635 N.E.2d 331 (1994) ("The decision is one for the court—not any longer a jury.").

**{¶152}** In any event, Appellants refer to the general principles governing compensatory damages. *See, e.g., Pryor v. Webber*, 23 Ohio St.2d 104, 107, 263 N.E.2d 235 (1970) ("In Ohio, as elsewhere, it is a rule of universal application in a tort action, that the measure of damages is that which will compensate and make the plaintiff whole."). *See also Williams*, 83 Ohio St.3d at 475 (conspiracy must result in actual damages). Appellants emphasize that Premier Therapy's brief does not respond to their argument nor point to any evidence presented in this case to support the additional award of $100,847.88.

**{¶153}** Premier Therapy generally states the award of an additional $100,847.88 was supported by the evidence, but they do not point to any evidence or say what this damage represented, e.g. they do not mention the topic of interest as discussed by their attorney in closing arguments. Regardless of where the jury placed the additional award of $100,847.88, the question is whether evidence supports this award (over and above the award of $592,928.72 which represented the amount of Premier Therapy's uncollected judgment against Holander House).

**{¶154}** We note that counsel has broad latitude in closing argument. *Pang v. Minch*, 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990). The bounds of permissible argument is left to the trial court's sound discretion. *Id.* at 194. Closing argument can encompass the evidence and fair inferences or deduction to be drawn from the evidence. *Barnett v. Thornton*, 10th Dist. No. 01AP-951, 2002-Ohio-3332, ¶ 27, 30. *Id.* ¶ 27. However, it is improper for counsel to advance arguments in closing that are not supported by the evidence. *Id.* at ¶ 30.

**{¶155}** Appellants did not object to the portions of closing argument asking for this amount to compensate for statutory interest nor are they arguing improper closing argument. Rather, they are arguing the portion of the damage award (over the amount owed to Premier Therapy by Holander House as set forth in the testimony) was unsupported by evidence.

**{¶156}** It is clear the disputed portion of the jury award stemmed from counsel's statement on statutory interest. Premier Therapy's brief does not attempt to make an argument on appeal explaining the issue. In any event, there was no

evidence presented to support an additional award of $100,847.88. "Closing arguments are not evidence." *State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E.2d 768 (1984). *See also Parrot v. Spring Industries, Inc.*, 5th Dist. No. 90AP050039 (Apr. 24, 1991) (plaintiff did not produce evidence to tie documents together; trial court granted directed verdict; plaintiff argued on appeal he would have explained to the jury how to calculate damages during his closing argument; appellate court affirmed directed verdict as there was no evidence as to how damages were to be calculated, closing arguments are not evidence, and the interpretation of the evidence required more than mere multiplication to determine damages).

{¶157} There was testimony on the amounts owed by Holander House to Premier Therapy and the amount of the judgment obtained against Holander House. There was no testimony or evidence presented as to the $100,847.88 figure awarded by the jury on the conspiracy claim in addition to the amount of the judgment previously recovered against Holander House.

{¶158} At oral argument, counsel referred us to the transcript at page 925 et seq. when asked about this issue. However, this is too little too late. The argument was not set forth in response to Appellant's brief, and Appellant could not respond to it in the reply brief. Moreover, the belatedly cited testimony merely explained why the judgment rendered against Holander House was for $592,928.72, but the invoices showed less than $530,000 was due. The therapy services agreement with Holander House, under the section addressing late payment of invoices, provided for a "services fee of 1.5%" on all outstanding amounts owed for each 30-day period beyond the due date.

{¶159} The contract specified that any termination of services would not negate the obligation for fees *accruing prior to* the effective date of the termination. The contractual fees would not continue to accrue after the obligation was reduced to judgment. Finally, the judgment against Holander House specified the 1.5% contractual rate would apply for the period prior to the judgment (and before the last calculation) and the statutory rate of interest would apply post-judgment. Yet, Premier Therapy's only presentation of this theory of damages to the jury appears to

have occurred in closing arguments. Premier Therapy has not disproved this premise. Considering counsel's closing argument in support of additional damages and the lack of corresponding evidence, we reverse a portion of the damage award in the amount of $100,847.88.

Part F: contingent on a failed fraudulent transfer claim

{¶160} Under a prior section, Appellants noted that if the fraudulent transfer claim fails, then the conspiracy claim fails since the fraudulent transfer claim was the underlying act alleged in the conspiracy. Under this section, Appellants add that if those two claims fail, then the award of punitive damages and attorneys' fees also fail. That is, the award of punitive damages and attorneys' fees made in the bifurcated second stage of trial were only possible due to the fraudulent transfer claim and the conspiracy claim (which is dependent on the fraudulent transfer). The result of this section is dependent upon the result of the fraudulent transfer arguments set forth in prior sections. As these arguments were overruled, the argument in part F is also overruled.

ASSIGNMENT OF ERROR FOUR: FEES

Part A: Expert Fees

{¶161} Appellants' final assignment of error addresses two aspects of the fees awarded by the trial court after trial: expert witness fees and attorneys' fees. On the issue of expert witness fees, the fourth assignment of error contends:

"THE TRIAL COURT ERRED IN AWARDING THE PLAINTIFF ATTORNEY FEES * * * FOR AN AWARD OF EXPERT WITNESS FEES WITHOUT ANY STATUTORY AUTHORITY."

{¶162} Appellants claim expert witness fees are not awardable in connection with an award of punitive damages under R.C. 2315.21 or as costs of litigation under Civ.R. 54. Appellants cite case law in support of only the latter proposition. Premier Therapy concedes that expert witness fees are not to be regularly awarded as costs of litigation under Civ.R. 54; however, expert witness fees can be recovered where attorneys' fees' are recovered due to the imposition of punitive damages, and R.C. 2315.21 does not limit what is recoverable when considering attorneys' fees in this

context. Premier Therapy cites two analogous domestic relations cases where a statute permitted attorneys' fees and the court held expert witness fees would be recoverable as well. *See O'Brien v. O'Brien*, 5th Dist. No. 2003-CA-F12069, 2004-Ohio-5881, ¶ 82-85; *Tonti v. Tonti*, 10th Dist. Nos. 03AP-494, 03AP-728, 2004-Ohio-2529, ¶ 112-115.

**{¶163}** Appellants claim these cases are distinguishable because of the context but cite no cases in opposition of the premise. Furthermore, Appellants failed to raise in the trial court the argument they now raise to this court. Premier Therapy specifically itemized and sought payment for $22,000 in expert witness fees for the business valuation expert who testified at trial. This demand was set forth at least four times in the brief in support of attorneys' fees. (Premier Therapy's 1/26/15 Brief in Support at 1-3, 8). In addition, at the hearing on fees, testimony was presented that expert witness fees were incurred in the amount of $22,000. (Tr. 26, 36-37, 60, 62-63, 78). Appellants presented no argument at the hearing pertinent to the expert fees.

**{¶164}** After the hearing, Appellants filed a brief in opposition to attorneys' fees and a brief in further opposition. On the topic of expert witness fees, Appellants first claimed Premier Therapy should not be permitted to recover the fees of the expert because they failed to meet the burden at the hearing on attorneys' fees *to show the reasonableness of the fee charged by the expert.* (Appellants' 6/12/15 Brief in Opposition at 8). In a further filing, they alternatively added they should not be responsible for *the entire expert fee* since there were originally other defendants. (Appellants' 7/8/15 Brief in Further Opposition at 3). (These arguments are not maintained on appeal.)

**{¶165}** At no point did Appellants raise the contention that a court cannot award expert witness fees when calculating attorneys' fees after a jury finds punitive damages and attorneys' fees are warranted. In accordance, Appellants have failed to preserve the argument for purposes of appeal. *See, e.g., Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 34; *Blausey v. Stein*, 61 Ohio St.2d 264, 266-67, 400 N.E.2d 408 (1980).

**{¶166}** In civil cases, the doctrine of plain error "is sharply limited to the extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122, 679 N.E.2d 1099 (1997). Based upon the following law, we conclude there is no obvious deviation from a legal rule that challenges the legitimacy of the judicial process and the award of expert fees does not involve a rare situation with exceptional circumstances.[11]

**{¶167}** The statute relied upon by Appellant, R.C. 2315.21, discusses when punitive damages are recoverable, provides for the burden of proof, and explains the bifurcation of the punitive damages stage of trial. In setting forth caps for punitive damages, the statute provides: "Any attorneys fees awarded as a result of a claim for punitive or exemplary damages shall not be considered for purposes of determining the cap on punitive damages." R.C. 2315.21(D)(2)(c). This provision was added in the 2005 amendments with the caps. As Premier Therapy notes, the statute is not the basis for an award of attorneys' fees; it merely excludes them from the cap on damages. In fact, the Supreme Court describes attorneys' fees (awarded after a finding that punitive damages are warranted) as an element of compensatory damages. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 35, 734 N.E.2d 782 (2000).

**{¶168}** Pursuant to Civ.R. 54(D), "Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." As Premier Therapy concedes, this rule does not support an award of expert witness fees merely because it was the prevailing party. The categories of litigation expenses which qualify as costs under Civ.R. 54(D) is very limited. *Williamson v. Ameritech Corp.*, 81 Ohio St.3d 342, 343, 691 N.E.2d 288 (1998). "Costs are generally defined as the statutory fees to which

---

[11] Although the waiver doctrine is well-settled, it is equally well-settled that the waiver doctrine is discretionary with the reviewing court. *Javorsky v. Sterling Med.*, 7th Dist. No. 14 MA 87, 2015-Ohio-2113, ¶ 14, citing *Hill v. Urbana*, 79 Ohio St.3d 130, 133-134, 679 N.E.2d 1109 (1997). Likewise, there is the concept of plain error, i.e. in order to hold there was no plain error, an outline of the law is warranted. In deciding whether to proceed to analyze the issue, this court may consider whether the argument is one that needs addressed for the benefit of the court system.

officers, witnesses, jurors, and others are entitled for their services in an action and which the statutes authorize to be taxed and included in the judgment." *In re Election of November 6, 1990 for the Office of Atty. Gen. of Ohio*, 62 Ohio St.3d 1, 4, 577 N.E.2d 343 (1991) (a particular litigation expense will not qualify as part of "costs" unless it is fixed and taxable according to statute).

{¶169} Costs are not synonymous with litigation expenses unless expressly made so by statute. *Id.* As the subject of costs is one entirely of statutory allowance and control, the general rule is that attorneys' fees cannot be recovered as the costs of litigation in the absence of statutory authorization. *Sorin v. Board of Edn. of Warrensville Hts. Sch. Dist.*, 46 Ohio St.2d 177, 180-181, 347 N.E.2d 527 (1976); *In re Election*, 62 Ohio St.3d at 3-4.

{¶170} Likewise, the general rule is that expert witness fees cannot be recovered as costs without statutory authorization. *In re Election*, 62 Ohio St.3d at 3-4, *Moore v. Gen. Motors Corp.*, 18 Ohio St.3d 259, 260-61, 480 N.E.2d 1101 (1985), citing *Benda v. Fana*, 10 Ohio St.2d 259, 227 N.E.2d 197 (1967). "Absent statutory directive, an expert witness fee is not a 'cost.'" *State ex rel. Williams v. Colasurd*, 71 Ohio St.3d 642, 644, 646 N.E.2d 830 (1995).

{¶171} As Premier Therapy points out, it was not seeking expert witness fees (or attorneys' fees for that matter) as costs under Civ.R. 54(D). These cases on costs do not involve the recovery of attorneys' fees or litigation expenses under the undisputed punitive damage exception to the "American" rule (which rule requires the parties to bear their own litigation expenses). As aforementioned, Appellants cite no cases in support of a holding that expert witness fees cannot be considered in structuring an award of attorneys' fees.

{¶172} Regardless of the subject of statutory costs, expert witness fees and attorney fees are both considered litigation expenses. *See In re Election*, 62 Ohio St.3d at 4; *Ohio Edison Co. v. Franklin Paper Co.*, 18 Ohio St.3d 15, 16-17, 479 N.E.2d 843 (1985). *See, generally, Schuller v. United States Steel Corp.*, 103 Ohio St.3d 157, 2004-Ohio-4753, 814 N.E.2d 857, ¶ 8 (interpreting a statute permitting recovery of "costs of legal proceedings" as not allowing reimbursement for the

everyday costs of doing business but allowing recovery of litigation expenses, such as a medical expert's fee). The language of the general holding is significant: "Generally, an unsuccessful litigant is not liable for *the litigation expenses*, including attorney fees, of its adversary in the absence of a statute providing for their allowance." (Emphasis added). *Ohio Edison*, 18 Ohio St.3d at 16-17.

**{¶173}** As recognized here, there is common law exception to the recovery of litigation expenses in cases involving malice or the like. *See id.* at fn. 2. This exception is most often framed in terms of attorneys' fees. As Appellants acknowledge, where punitive damages are proper, the aggrieved party can also recover reasonable attorneys' fees. *Galmish*, 90 Ohio St.3d at 35; *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 41, 543 N.E.2d 464 (1989); *Sorin*, 46 Ohio St.2d at 181 (a well-settled exception to the "American" rule). *See also Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 558, 644 N.E.2d 397 (1994) ("Attorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted.").

**{¶174}** There is also a contractual exception. Notably, where an insurance contract bound the insurer to pay on behalf of the insured all damages except punitive damages, the Supreme Court ruled the agreement did not prohibit the injured party's recovery of attorneys' fees *and other litigation expenses* (even though derived from the punitive damage award against the insured). *Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 2 (trial court awarded an amount for attorneys' fees and an amount for expenses). The First District has permitted recovery of other litigation expenses where a contract provided for attorneys' fees. *New Concept Hsg., Inc. v. United Dept. Stores*, 1st Dist. No. C-080504, 2009-Ohio-2259, ¶ 37-38 (where the promissory note allowed recovery for "reasonable fees of the attorney at law," appellant unsuccessfully argued an award for other litigation expenses was improper).

**{¶175}** Moreover, in awarding attorney fees, a trial court is permitted to consider the miscellaneous expenses of the litigation. *Villella*, 45 Ohio St.3d at 41; *Hutchinson v. J.C. Penney Cas. Ins. Co.*, 17 Ohio St.3d 195, 200, 478 N.E.2d 1000

(1985). "When the expenses generated in an attorney's office can be clearly and directly traced to the costs associated with a particular matter, those expenses are not properly considered part of an attorney's overhead and can properly be charged as legal fees for that particular matter." *In re Adoption of Bruner*, 7th Dist. No. 05 MA 68, 2006-Ohio-497, ¶ 34 (applying the law to paralegal rates), citing *Villella*, 45 Ohio St.3d at 41. The award of attorneys' fees where punitive damages are warranted is a common law remedy. *See, e.g., Roberts v. Mason*, 10 Ohio St. 277, 282 (1859). Likewise, certain laws have been enacted in order to codify the courts' historic authority to award litigation expenses where there was egregious conduct. *See* Official Comment to R.C. 5810.04 ("Generally, litigation expenses were at common law chargeable against another party only in the case of egregious conduct such as bad faith or fraud.").

{¶176} The collection of authority reviewed supra leads this court to the following conclusion: litigation expenses in the form of expert witness fees can be considered by the trial court when calculating attorneys' fees due to the prior finding that punitive damages and attorneys' fees were warranted.

{¶177} Finally, it is not an unusual practice for courts to permit the recovery of litigation expenses, such as expert witness fees, in connection with the recovery of attorneys' fees after punitive damages are found proper. *See Parrish v. Machlan*, 131 Ohio App.3d 291, 297, 722 N.E.2d 529 (1st Dist.1997) ("Litigation expenses may also be awarded as part of punitive damages"; upholding inclusion of litigation expenses where plaintiff recovered $1,000 in punitive damages, $2,397 in attorney fees, and $454.50 in litigation costs). *See also Nordquist v. Schwartz*, 7th Dist. No. 11 CO 21, 2012-Ohio-4571, ¶ 25, 50 (implicitly accepting that the recovery of expert witness fees and case expenses falls under the rubric of attorneys' fees). In fact, Appellants did not raise this issue below and proceeded as if the recovery of expert fees was standard practice when addressing attorneys' fees.

{¶178} For all of the foregoing reasons, this part of Appellant's fourth assignment of error is overruled.

## Assignment of Error 4, Part B:  Attorneys' Fees

**{¶179}** As to the second fee issue, Appellant's fourth assignment of error reads:

"THE TRIAL COURT ERRED IN AWARDING THE PLAINTIFF ATTORNEY FEES FOR A MATTER OVER WHICH THE COURT HAD NO JURISDICTION * * *."

**{¶180}** Appellants urge the trial court was not permitted to consider fees that resulted during an action that was voluntarily dismissed.  Appellants ask this court to vacate the portion of the award representing $71,157 in fees expended by the law firm then known as Manchester Bennett.  Appellants do not contest the portion of the award representing the $213,443.20 in attorneys' fees expended by the law firm of Rolf Goffman Martin Lang, LLP, who represented Premier Therapy at trial.  The amounts were derived from the documents and testimony presented at the attorneys' fees hearing.  The actual amount of time expended was reduced to account for the work attributable only to the claims against these defendants, i.e. reductions were implemented due to the original presence of other defendants.

**{¶181}** As set forth in the statement of the case supra, the lawsuit was originally filed against Appellants as case number 2011 CV 516 (before the bank and law firm were added).  Premier Therapy was represented by the law firm of Manchester Bennett.  The case was voluntarily dismissed on September 21, 2012.  At that time, the amount owed to Manchester Bennett was said to be $127,104.33, with $71,157 attributed to the claims against Appellants.  The current action, 2013 CV 293, was refiled by the Rolf Goffman law firm.

**{¶182}** A trial court has discretion to determine the appropriate amount of attorneys' fees to award in each case; therefore, a fee award is not generally overturned on appeal absent an abuse of discretion.  *Bittner v. Tri–County Toyota, Inc.,* 58 Ohio St.3d 143, 146, 569 N.E.2d 464 (1991).  An abuse of discretion is more than mere error of law or judgment; rather, it involves an unreasonable, arbitrary, or unconscionable decision.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).  It is for the trial court to ascertain whether the rate per hour and the number of hours expended were reasonable and to work up or down from that

number using various factors as the court sees fit. *See Bittner*, 58 Ohio St.3d 143. "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Id.* at 146.

{¶183} Here, there was expert testimony that the fee request for the time spent by Manchester Bennett was reasonable for significant motion practice and discovery. (Fees Tr. 93). Appellants do not currently dispute whether the amount was reasonable. Instead, they broadly dispute whether the fees incurred by this firm were recoverable at all since they were incurred for a suit which was later voluntarily dismissed. Appellants note Premier Therapy's voluntary dismissal in 2011 CV 516 removed that lawsuit from the trial court's jurisdiction.

{¶184} From this, they conclude the trial court lacked jurisdiction to consider any attorneys' fees incurred while working on that case. They cite case law concerning the general effect of a voluntary dismissal on the court's jurisdiction. *See, e.g.*, *State ex rel. Hummel v. Sadler*, 96 Ohio St.3d 84, 2002-Ohio-3605, 771 N.E.2d 853, ¶ 2 (when a case has been voluntarily dismissed under Civ.R. 41(A)(1), the trial court patently and unambiguously lacks jurisdiction to proceed). They cite no law providing that a court cannot award pre-litigation attorneys' fees if those fees were incurred during an action that was voluntarily dismissed (and then refiled as the current action).

{¶185} Premier Therapy responds that the attorneys' fees incurred in the prior filing were the direct consequence of the conduct at issue in the current case, i.e. the fees were related to the prosecution of the case against Appellants. Premier Therapy insists it is irrelevant if the fees were incurred prior to the filing of the complaint in the current lawsuit as pre-litigation attorneys' fees are permitted, citing *Luft v. Perry Cty. Lumber & Supply Co.*, 10th Dist. 02AP-559, 2003-Ohio-2305.

{¶186} In *Luft*, the defendant argued the trial court abused its discretion in ordering it to pay for fees associated with services rendered by the plaintiff's former attorney, who was retained in the pre-litigation stages to reach a settlement. *Luft*, 10th Dist. 02AP-559 at ¶ 39 (also arguing they were not the only potential defendant).

The Tenth District overruled this argument, *finding no prohibition against awarding attorney fees for services rendered prior to the filing of the complaint. Id.*

**{¶187}** Rather than disputing the propriety of this holding or the relevancy of the fees to the current action, Appellants' reply brief attempts to distinguish *Luft* on the basis that it did not deal with fees incurred during a prior voluntarily dismissed suit. They insist the fact pre-litigation expenses were occurred during a prior suit that was voluntarily dismissed makes the issue jurisdictional.

**{¶188}** However, the trial court was not rendering a decision in the prior case. Rather, the court, after presiding over trial in the refiled case, was issuing a decision on what attorneys' fees were incurred due to the acts of Appellants that resulted in the judgment in the current case. The issue is not one of jurisdiction.

**{¶189}** Moreover, to the extent the argument can be recharacterized, Appellants did not raise to the trial court a contention that the court could not consider the work performed by Manchester Bennett in the 2011 case due to the voluntary dismissal filed in that case. Rather, Appellants asked the trial court to exclude time spent related to the 2009 judgment against Holander House *until the 2011 case was filed.*[12]

**{¶190}** On that topic, the testimony at the fee hearing was that two depositions were taken before the 2011 suit was filed. Yet, these depositions were used in the motion practice for the current case. (Tr. 57-58). A document subpoena was also issued, but this was used as evidence in the current case. (Tr. 58). As aforementioned, Appellants do not contest the principle that pre-litigation costs can be recovered, urging instead the fees from the 2011 case cannot be considered *due to the voluntary dismissal.*

**{¶191}** As for the 2011 case, Manchester Bennett responded to motions and conducted discovery. (Tr. 58-59). Premier Therapy's brief in support of attorneys' fees said this discovery was used in the current case *pursuant to Appellants' request.* Appellants did not dispute this. Nor did they present the trial court with any theory

---

[12] Other arguments were made below but are not maintained on appeal.

that it was not permitted to consider work performed during the 2011 case. The argument was not preserved. *See, e.g., Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 34; *Blausey v. Stein*, 61 Ohio St.2d 264, 266-67, 400 N.E.2d 408 (1980). In fact, the argument presented below essentially acknowledged the Manchester Bennett fees incurred during the 2011 case could be considered in this case.

{¶192} In sum, Appellants did not contest the court's ability to consider fees incurred in the 2011 case. The fact that the case was voluntarily dismissed did not per se render the court without "jurisdiction" to consider time expended by attorneys on items related to the current case prior to its filing. This broad jurisdictional argument is the only one raised on appeal. Appellant's argument as to attorneys' fees is overruled.

{¶193} For the foregoing reasons, a portion of the damage award in the amount of $100,847.88 is reversed and vacated. We also hold the doctrine of veil piercing cannot be applied to Brewster Parke, Inc., who remains liable for fraudulent transfer and civil conspiracy. The remainder of the judgment is affirmed.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.